895 So.2d 282 (2004)
FORT JAMES OPERATING COMPANY
v.
William F. IRBY, Jr.
2020598.
Court of Civil Appeals of Alabama.
January 9, 2004.
Certiorari Denied April 30, 2004
*283 Terry A. Moore of Vickers, Riis, Murray & Curran, L.L.C., Mobile, for appellant.
William L. Utsey and Tara B. Armistead of Utsey & Utsey, Butler, for appellee.
Certiorari Denied (as to William Irby) April 30, 2004
Alabama Supreme Court (1030620).

On Applications for Rehearing
THOMPSON, Judge.
The opinion of September 12, 2003, is withdrawn, and the following is substituted therefor.
William F. Irby, Jr., sued his former employer, Fort James Operating Company ("Fort James"), seeking to recover workers' compensation benefits. Fort James answered and denied liability. On September 20, 2002, the trial court entered a judgment in which it found Irby to be permanently, totally disabled and awarded benefits accordingly. Irby moved for an award of costs, and Fort James filed a postjudgment motion. The parties agreed, pursuant to Rule 59.1, Ala. R. Civ. P., to extend the 90-day period for the consideration of the postjudgment motion. The trial court entered an amended judgment on February 13, 2003. In that amended judgment, the trial court reiterated the findings of fact and conclusions of law set forth in its original judgment, awarded Irby certain costs, and denied Fort James's postjudgment motion. Fort James timely appealed.
The record indicates that Irby worked in various capacities for Fort James for approximately 32 years and that, at the time of the trial of this matter, Irby was 60 years old. Irby's jobs for Fort James included working as a pipe fitter and working in Fort James's fire-protection department.
On July 7, 1997, the fire-protection department members practiced for a fire contingency on a riverbank on Fort James's property. Irby testified that while he was walking on the "riprap," or large rocks, located on the riverbank, a rock moved and his right foot slipped between *284 some rocks, causing him to fall; Irby injured his ankle in that incident. Irby testified that a coworker helped him walk back up the riverbank and that his foot and ankle became swollen shortly after his fall. Irby testified that, although his foot was still swollen, he worked the next day, a Friday, for Fort James. Irby explained that he was able to sit for much of the day Friday because of the nature of his job duties on Fridays.
According to Irby, on the Saturday following his fall on the riverbank, he was sitting at home watching television with his foot and ankle elevated and iced when he stood up from his chair and felt a sharp "popping" sensation in his ankle and experienced severe pain. Irby sought medical treatment for his ankle injury the following Monday.
Irby first sought treatment from Dr. Gus A. Rush, who diagnosed Irby as having a subluxation of the tendons in his ankle. Dr. Rush performed surgery on Irby's ankle in late July 1997 to correct the injured tendons; Dr. Rush testified that during that surgery he discovered that Irby had arthritis in his ankle. Irby testified that he informed Dr. Rush that he felt tendons moving or "popping" in his ankle during the time that he had a postoperative cast on his ankle but that Dr. Rush told him that that sensation was "in [his] mind." Dr. Rush treated Irby until October 1997. Irby attempted to return to work at Fort James in November 1997, but he was unable to perform his job duties.
Irby was subsequently seen by Dr. James L. Thomas, a podiatrist, who first treated Irby on November 25, 1997. Dr. Thomas performed a CT scan on Irby's ankle and discovered a fracture in the bone between the ankle and the top of Irby's foot. Dr. Thomas opined that that fracture was several months old and that it had healed. Dr. Thomas also concluded that Irby continued to have problems with the subluxation of the tendons in his ankle; he stated that the repairs performed during the July 1997 surgery had "lost support" and that the support needed to be reestablished. Dr. Thomas performed surgery to correct both the tendon condition in Irby's ankle and to remove some bone near the healed fracture in Irby's foot.
In addition to the foot and ankle injury, Irby had preexisting diabetic neuropathy, which caused him to feel a burning sensation in his feet. Irby testified at trial that he had had that sensation for approximately 10 years and that it had not prevented him from performing the duties of his employment at Fort James.
Irby began experiencing low-back pain that he attributed to being caused by the alteration in his gait that, he said, resulted from his compensating for the injury to his ankle. In September 1998, Irby sought treatment from Dr. Vlad Prelipcean for low-back pain. Dr. Prelipcean opined that it was more likely than not that Irby's ankle injury caused him to alter his gait and that that alteration in Irby's gait brought on the low-back pain. Fort James emphasizes on appeal that Irby had preexisting arthritis in his back. It is undisputed, however, that before his ankle injury any back pain Irby may have suffered did not prevent him from performing his job duties at Fort James.
Dr. Thomas testified that it was possible that Irby's back pain was caused by an altered gait that resulted from Irby's foot and ankle injury. Dr. Prelipcean stated that, although he agreed that Irby's back-pain symptoms were consistent with the symptoms of arthritis, he believed that Irby's chronic low-back pain was aggravated by Irby's inability to walk properly because of his ankle injury. Dr. Rush *285 testified that, although limping can create back-pain symptoms, if Irby's back-pain symptoms were caused by an altered gait attributable to his ankle injury, those symptoms should have appeared before September 1998.
In April 1998, Dr. Thomas returned Irby to work with restrictions; those restrictions included no standing or walking for more than 4 hours out of an 8-hour shift; no more than 15-30 minutes of standing or walking at any one time; no lifting more than 25 pounds; no walking on uneven surfaces; and no climbing stairs or working at heights. Dr. Thomas stated that, initially, the restrictions were primarily based on Irby's diabetic neuropathy. Dr. Thomas stated, however, that as of December 2000, when Irby's ankle injury did not improve, he would have placed Irby on the same restrictions as a result of the ankle injury.
Irby testified that he attempted to return to work in April 1998 but that he was informed that Fort James did not have a job for him that met the restrictions imposed by Dr. Thomas. Therefore, Irby testified, he decided to retire and apply for his pension that was available through his employment with Fort James.
Bill Vincent, a vocational-rehabilitation consultant, testified that, given the restrictions placed on Irby and various other factors, he believed that Irby was permanently and totally disabled. In reaching that conclusion, Vincent considered factors such as Irby's age; his education; his history of working as a manual laborer; the nature of his injury, which caused chronic pain; and the job market in the rural area in which Irby resided.
On appeal, Fort James first argues that the trial court erred in determining that Irby's claim for compensation should not be limited to a scheduled injury. See § 25-5-57(a)(3), Ala.Code 1975 (setting forth the compensation schedule for certain injuries). Fort James contends that Irby's recovery should be limited to compensation for a 22% impairment to his right leg resulting from the ankle injury.[1] In making this argument, Fort James contends that the trial court failed to apply our supreme court's recent holding in Ex parte Drummond Co., 837 So.2d 831 (Ala.2002).
In Ex parte Drummond Co., the trial court determined that a worker who had injured his knee had suffered a 50% permanent total disability. This court affirmed that judgment. See Drummond Co. v. Pate, 837 So.2d 829 (Ala.Civ.App.2001). Our supreme court reversed the trial court's judgment. Ex parte Drummond Co., 837 So.2d at 837. In doing so, the court addressed the issue whether the worker's knee injury should be compensated under the schedule contained in § 25-5-57(a)(3), or whether that injury was outside the list of scheduled injuries because it caused an impairment to the body as a whole. The court adopted a new test for determining when an injury to a scheduled member should be treated as an unscheduled injury. That test, set *286 forth in 4 Lex K. Larson, Larson's Workers' Compensation Law § 87.02 (2001), and quoted in the court's opinion, provides that "`[t]he great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.'" Ex parte Drummond Co., 837 So.2d at 834. In applying that test to the facts of the case, our supreme court concluded that the worker had failed to present "substantial evidence indicating that `the effects of the loss of the member extend[ed] to other parts of the body and interfere[d] with their efficiency.'" Ex parte Drummond Co., 837 So.2d at 836 (quoting Larson, supra).
Although the evidence at the trial in this case was disputed, the trial court made the following findings and conclusions in that part of its judgment that addressed the issue whether the injury to Irby's ankle extended to his body as a whole:
"[Irby] was treated by several doctors. After being seen first by the mill doctor, Dr. Keith Aldridge, an osteopath, he went to Gus A. Rush, M.D., an orthopaedic surgeon in Meridian, Mississippi. Dr. Rush [performed] surgery on [Irby's] right ankle and leg which was not successful. [Irby] then went to James Thomas, M.D., ... who [performed] surgery again on [Irby's] right ankle and leg. [Irby] also saw Vlad Prelipcean, M.D., board certified in internal medicine, who treated him for his back. Dr. Prelipcean's first treatment of [Irby's] back and the kind of pain he was experiencing was on September 24, 1998. The history taken by [Dr. Prelipcean] revealed that [Irby] had experienced trauma to his right ankle which required two surgeries, and [that Irby] was having difficulty walking. The history revealed that [Irby] experienced low-back pain after that incident. At first, [the pain] could be relieved with Motrin and rest, but then [Irby] began to have periods when it kept him awake at night. [Dr. Prelipcean] confirmed that [Irby] had significant limitation and range of motion in his shoulder, lumbar spine, and the left sacroiliac joint. He gave [Irby] injections to his back with steroids and anesthetics, which helped [Irby] and was a clear indication of where he was having his problem. [Dr. Prelipcean] was of the opinion that it is a rather usual occurrence for one's gait to change following surgical procedures to any of the major joints of the lower extremity and then lead to secondary back strain that may indeed produce pain. Dr. Prelipcean agreed that he believed [Irby] was experiencing low-back pain because [Irby] had to alter his gait secondary to increased ankle pain. [Dr. Prelipcean] continued to see [Irby] for his low-back pain and [Irby] continued to get worse. [Dr. Prelipcean's] official diagnosis was persistent low-back pain, most likely aggravated by [Irby's] inability to walk properly after the ankle fracture. [Dr. Prelipcean] continued to see [Irby] for the next year and a half, and almost all of these visits were related to [Irby's] low-back pain. The end result of the problems that [Irby] was having was that he became very significantly limited in his ability to walk, at the end being able to walk only maybe 20-30 yards because of pain. [Dr. Prelipcean] expressed the opinion that the chronic low-back pain is aggravated by the abnormal gait [Irby] has as a consequence of the fracture to his ankle and the torn tendons. The Court finds the evidence to be clear and convincing that the injury to the right ankle and the surgeries [Irby] had to have indeed altered the gait of this plaintiff *287 and has produced and caused him chronic low-back pain that he was not having to this degree before the accident. The Court finds that such pain is a factor in this man becoming disabled. Following surgery to [Irby's] ankle and leg, he began to walk with a limp and use a cane. [Irby] began to have back and hip problems which he associated with his ankle injury. The Court finds that based on all of the evidence, there is no doubt the ankle injury produced back and hip problems to [Irby] which he was not having before the accident and that these problems were in fact different and much worse than anything [Irby] was experiencing due to arthritis before the injury to his leg.
"The Court finds that based on all of the evidence, [Irby] received a severe injury at work that severely crippled him and affected his hip and back and that this combined with the broken ankle and torn tendons to cause [Irby] to be totally and permanently disabled.
". . . .
"The Court heard [Irby] testify and he was very believable. The Court observed [Irby] while in Court and it was obvious that he could move only with the greatest of difficulty. It is obvious to the Court that [Irby] has problems with his right leg, walks with an impaired gait, uses a cane and foot brace, and has back and hip trouble as a result of this."
We note that Fort James also asserts in its brief on appeal that because Irby retired before he first sought treatment for his low-back pain, there is no evidence that his work restrictions or his inability to work is related to that low-back pain; therefore, it contends that there is no evidence that Irby suffered a greater incapacity as a result of his low-back pain. As Fort James states in its brief, "[f]or aught that appears in the record, Irby would have the same restrictions and the same disability regardless of his back and hip problem[s]." That statement appears to be accurate; Dr. Thomas testified that, had he been asked to reassess Irby's restrictions at the time of his last treatment of Irby in December 2000, he would have placed the same restrictions on Irby that he had in April 1998 and that those restrictions would have been related to Irby's ankle injury. Vincent, the vocational expert, seems to have based his determination of Irby's total disability on the restrictions imposed in April 1998 that were related solely to Irby's ankle.
In Ex parte Drummond Co., supra, the worker returned to work after his knee injury and worked until he was laid off. The worker had occasional swelling in his knee. Our supreme court determined that the worker's injury did not qualify as one that extended to other parts of his body and caused a greater incapacity or interfered with the efficiency of other parts of the worker's body. Ex parte Drummond Co., supra.
In this case, however, the evidence indicates that Irby often or constantly suffered pain in his ankle, that he often had to elevate his ankle to prevent or reduce swelling, and that the ankle injury interfered with Irby's ability to walk. Thus, the evidence related solely to Irby's ankle does demonstrate that Irby's ankle injury created "a greater incapacity than would otherwise result from his injury." Ex parte Drummond Co., 837 So.2d at 836. Further, in addition to the problems caused by his ankle, there was evidence in the record to support a determination that Irby's low-back pain contributed to worsen Irby's condition. Irby's own testimony established that his low-back pain operated to lessen his mobility and to increase his pain. Therefore, we cannot say that Fort James has demonstrated that the trial *288 court erred in concluding that Irby's back condition contributed to his overall incapacity or disability.
Fort James, as a part of its argument on this issue, asserts that the standard for determining whether Irby's ankle injury caused his back pain is the "clear and convincing evidence" standard. In its judgment, the trial court stated that it found that clear and convincing evidence supported Irby's claim that his ankle injury caused his low-back pain. However, in Ex parte Drummond Co., supra, our supreme court applied the "substantial evidence" test in determining that the worker in that case had not presented "any evidence, substantial or otherwise" to support his claim that his injury extended to another part of his body other than the scheduled member. Ex parte Drummond Co., 837 So.2d at 836. "Substantial evidence" has been defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). The Workers' Compensation Act, § 25-5-1 et seq., Ala.Code 1975, provides that "[i]n reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." § 25-5-81(e)(2), Ala.Code 1975.
Our review of the evidence indicates that, although the evidence contained in the record on appeal was in dispute with regard to whether Irby's ankle injury extended to other parts of his body, the trial court's factual findings, set forth above, and its determination that Irby's ankle injury caused his low-back pain, are supported by substantial evidence. See West v. Founders Life Assurance Co. of Florida, supra. We also conclude that any error the trial court might have made in purporting to apply the "clear and convincing evidence" standard, which requires a higher level of evidentiary proof that the "substantial evidence" standard, is harmless.
Fort James also argues that, assuming this court affirms that part of the trial court's judgment pertaining to its liability for workers' compensation benefits, the trial court erred in denying Fort James certain credits or setoffs when it calculated the amount of benefits Fort James must pay Irby.
Section 25-5-57(c), Ala.Code 1975, provides, in pertinent part:
"(c) Setoff for other recovery. In calculating the amount of workers' compensation due:
"(1) The employer may reduce or accept an assignment from an employee of the amount of benefits paid pursuant to a disability plan, retirement plan, or other plan providing for sick pay by the amount of compensation paid, if and only if the employer provided the benefits or paid for the plan or plans providing the benefits deducted.
". . . .
"(3) If an employer continues the salary of an injured employee during the benefit period or pays similar compensation during the benefit period, the employer shall be allowed a setoff in weeks against the compensation owed under this article...."
Fort James argues that the trial court erred in refusing to award it a credit for disability-retirement benefits it provided or paid for Irby. The record indicates that, when Irby attempted to return to work in April 1998, Fort James did not have any jobs that would accommodate his medical restrictions. Therefore, Irby chose to retire.
*289 Fort James is a contributor to the "PACE Industry Union-Management Pension Fund" ("the PACE fund"), which is administered by the union of which Irby is a member. Other employers in the industry also contribute to the PACE fund on behalf of their employees. There are three ways in which a employee may qualify for a pension under the PACE fund: (1) by reaching the age of 65 ("regular retirement"); (2) by reaching the age of 55 and having 10 years of vested service ("early retirement"); or (3) by becoming permanently and totally disabled after 10 years of vested service ("disability retirement").
At the time Irby retired from Fort James, he qualified for both early retirement and disability retirement. Under the early-retirement plan, Irby would have received $457 per month in pension benefits. However, Irby retired under the disability-retirement plan and receives $1,027 per month in monthly benefits; that amount is the same amount Irby would have received if he had retired in April 1998 but had elected to wait until the age of 65, when he would qualify for regular retirement, to receive pension benefits. If Irby had not been determined by the PACE fund to be disabled in April 1998, and if he had continued working for Fort James until he reached the age of 65 and qualified for regular retirement, he would have accrued retirement benefits in addition to those that had accrued by April 1998; therefore, his regular-retirement monthly pension benefits would have been greater.
Fort James cites Ex parte Dunlop Tire Corp., 706 So.2d 729 (Ala.1997), and Ex parte Taylor, 728 So.2d 635 (Ala.1998), in support of its argument that it is entitled to a setoff for the amount of the disability-retirement benefits Irby receives. Fort James has also made the argument that, at a minimum, it is entitled to a setoff for that part of the disability-retirement benefits that exceed the amount Irby would have received had he elected to take an early retirement. In Ex parte Taylor, supra, our supreme court held that "§ 25-5-57(c)(1) allows benefits to be set off against workers' compensation benefits if the plan whose benefits are to be set off has additional benefits based on the injury, e.g., sick pay." 728 So.2d at 638. Thus, Fort James argues, the trial court erred in refusing to offset the monthly disability-retirement benefits, or a portion thereof, Irby receives against its liability to Irby for workers' compensation benefits.
The issue in Ex parte Dunlop Tire Corp., supra, was whether the employer paid for or provided the benefits with which it sought to offset its liability for workers' compensation benefits. Our supreme court held that § 25-5-57(c)(1) allows an employer to offset its workers' compensation liability by "the amount of benefits paid or payable under a qualifying disability, retirement, or sick pay plan." 706 So.2d at 731. Thus, if an employee contributed to or paid for the benefits, the employer would not be entitled to a setoff for the amount of those benefits paid. Our supreme court concluded that the employer had provided the benefits for which it sought a setoff and, therefore, that the employer was entitled to the setoff. Ex parte Dunlop Tire Corp., 706 So.2d at 735.
In so holding, the court noted that the mere fact that the benefits were paid by the employer on behalf of the employee as a portion of the employee's compensation did not change the character of those benefits to ones being provided or paid for by the employee. Ex parte Dunlop Tire Corp., supra. In dicta, the court also stated:
"If, because of a workplace injury, an employee receives benefits, but the receipt of those benefits will diminish other benefits that he would otherwise receive, the employee may be said to have *290 `paid for' those disability benefits by the reduction in the employee's nondisability benefits. For example, if a 55-year-old employee suffers a disabling workplace injury and receives a 10-year disability retirement under a plan provided or paid for by the employer, but the employee's taking that disability retirement causes the employee's normal retirement benefits to be reduced, the reduction of the normal retirement benefits can be considered to diminish the extent to which the employer `pays for' the disability retirement plan. In such a case, the employee would partially `pay for' the disability retirement plan by having the normal retirement benefits reduced."
Ex parte Dunlop Tire Corp., 706 So.2d at 734.
The facts of Cross v. Goodyear Tire & Rubber Corp., 793 So.2d 791 (Ala.Civ.App.2000), are similar to those of this case. In Cross, the employer offered several retirement plans; those options included regular retirement, early retirement, and disability retirement. The worker did not qualify to retire under the regular- or early-retirement plans, but, as a result of her on-the-job injury, she was entitled to, and did in fact, retire under the disability-retirement plan. The trial court allowed the employer to set off the amount of the worker's disability-retirement benefits from the amount of workers' compensation benefits that the employer was required to pay the worker. This court found that,
"under § 25-5-57(c)(1), as interpreted in Dunlop and Taylor, the pertinent question is whether the benefits being paid to the employee by the employer are (a) `disability-plan' benefits paid as a result of a disability arising from a job-related injury, or (b) `normal-retirement-plan' benefits paid solely because of the employee's age and length of service."
Cross, 793 So.2d at 794. This court affirmed the trial court's award of a setoff, concluding that because the employee did not qualify for early or regular retirement because of her age, the employee was entitled to receive retirement benefits only because of her disability. Cross, supra.
The retirement plans involved in this case are substantially similar to those involved in Cross, supra. Also as in Cross, the benefits paid to Irby are not based solely on his age and length of service; the disability-retirement benefits are paid to Irby as a result of his disability. However, in this case, Irby, unlike the claimant in Cross, qualified for both early retirement and disability retirement. Irby receives additional monthly retirement benefits because he retired under the disability-retirement plan rather than the early-retirement plan. We conclude that under the authority of Cross, supra, Fort James is entitled to a setoff, but only for that portion of the disability-retirement benefits that Irby receives that are in excess of those that he would have received had Irby retired solely because of his age and length of service.
We note that Irby has argued that the effect of the trial court's disallowance of the setoff prevents Irby from being "penalized" by his having been injured. This court addressed a similar argument in Cross. This court rejected the employee's argument that there should be no setoff because, but for her injury, the employee would still be working and accruing retirement benefits; it also rejected the employee's argument that a setoff was impermissible because the employee's injury caused a reduction in the amount of benefits to which she was entitled because she was not capable of continuing to work to accrue retirement benefits. Cross, supra. This court explained its reasoning as follows:

*291 "However, these factors do not alter the applicability of Dunlop, or the nature of the employee's pension as employer-provided disability benefits. As the Supreme Court noted in Dunlop, a diminution of normal retirement benefits caused by an inability to work during the years between an injury and normal retirement age does not constitute `payment' for disability-retirement benefits; `it is only if the receipt of disability benefits directly reduces the other benefits' that a question will arise as to whether the employee has paid for disability benefits with a reduction in other benefits. 706 So.2d at 735. Here, the employee, because she is injured, is able to immediately draw the same monthly pension she would have received upon reaching the age of 65 if she had voluntarily stopped working, and her immediate receipt of these benefits will not prevent her from continuing to receive them after she attains normal retirement age. Thus, we reject the employee's contention that the employer has impermissibly been allowed to set off its workers'-compensation obligation against `regular,' as opposed to `disability,' retirement benefits."
Cross, 793 So.2d at 794-95. Given the foregoing, we must reject Irby's argument that he would be "penalized" by the setoff of the difference in the amount he would receive under the early-retirement plan and what he receives under the disability-retirement plan.
Irby also contends that the facts of this case are distinguishable from those of Cross because, he asserts, in Cross the employer had its own retirement plan, whereas in this case the retirement plan is administered by the union of which Irby is a member. Thus, Irby contends, Fort James did not provide his retirement benefits, as is required for a setoff under § 25-5-57(c)(1), Ala.Code 1975. We conclude that that contention is without merit. It is undisputed that Fort James made certain contributions, which were negotiated through the union of which Irby is a member, for retirement benefits for its employees to be paid through the PACE fund; other employers in the same industry also make contributions to that fund on behalf of their employees. It is also undisputed that Irby did not contribute to the accumulation of his retirement benefits available through the PACE fund. Section 25-5-57(c)(1) provides that an employer who "provided the benefits or paid for the plan or plans providing the benefits" is entitled to a setoff in the amount of those benefits against its workers' compensation liability. In this case, although Fort James does not administer the PACE fund from which Irby receives his disability-retirement benefits, it did pay for the retirement benefits Irby receives. Therefore, we conclude that Irby's argument that his disability-retirement benefits are not provided or paid for by his employer is without merit.
Fort James also argues that the trial court erred in refusing to allow a setoff for compensation paid to Irby during the time Irby attempted to return to work at Fort James. In its amended judgment, the trial court did not address Fort James's assertion, made in its postjudgment motion, that it was entitled to a setoff for the amount of wages it paid Irby during the time that he worked for Fort James in November 1997. Irby conceded before the trial court that Fort James was entitled to a credit for any compensation he was paid for attempting to return to work in November 1997. This court has held that an employer is entitled to a setoff for a period in which an injured worker received both salary and workers' compensation benefits. Liberty Trousers Div. of Walls Indus., Inc. v. Amos, 738 So.2d 1272 (Ala.Civ.App.1999). Therefore, we must *292 reverse the trial court's judgment as to this issue and remand the case for the trial court to calculate the amount of wages Irby earned while attempting to return to work for Fort James in November 1997.
Next, Fort James maintains that under § 25-5-57(c), Ala.Code 1975, it was entitled to offset "vacation and holiday" pay it paid Irby during 1998 while Irby was also receiving workers' compensation benefits. Fort James contends that those forms of compensation fall within the term "similar compensation" as set forth in § 25-5-57(c)(3), Ala.Code 1975. The trial court denied Fort James's claim for a setoff based on its payment of vacation or holiday pay to Irby because, it determined, Irby had earned those benefits before his on-the-job injury.
In a related argument, Fort James also contends that it is entitled to a credit for sickness and accident benefits it paid to Irby during his disability. In making this argument, Fort James asserts that the parties stipulated that Irby had received $2,823.57 in "sick pay." Irby agrees that § 25-5-57(c)(1) provides a credit for employers who pay sick-pay benefits to a disabled worker "if and only if the employer provided the benefits or paid for the plan or plans providing the benefits deducted." See § 25-5-57(c)(1), Ala.Code 1975.
The effect of the trial court's refusal to allow Fort James a credit for its payment of vacation or holiday pay and sick pay to Irby is that Irby received that compensation in addition to receiving workers' compensation benefits for the same time periods. Our supreme court has stated that the Alabama Legislature's intent in enacting its 1992 amendments to the Alabama Workers' Compensation Act was, in part, to prevent a workers' compensation claimant from receiving a "double recovery" such as occurs when the claimant is paid both workers' compensation benefits and other benefits "that a worker might receive as a result of an injury." See Ex parte Taylor, 728 So.2d at 637 (stating that a worker could not receive both workers' compensation benefits and payments from a disability plan or a sick-pay plan paid as a result of an injury for the same time period).
However, as to the issues whether an employer is entitled to a credit for vacation or holiday pay and sick or accident pay, our supreme court has quoted with approval a Pennsylvania case that denied a setoff for those types of pay. See Ex parte Dunlop Tire Corp., supra, citing Toborkey v. Workmen's Comp. Appeal Bd. (H.J. Heinz), 655 A.2d 636 (Pa.Commw.Ct.1995). In explaining the rationale for its denial of that setoff, the Pennsylvania court stated:
"The Supreme Court noted in Temple [v. Pennsylvania Dep't of Highways, 445 Pa. 539, 285 A.2d 137 (1971),] that sick leave, like vacation pay, was `an incident or benefit provided under the work agreement and is an entitlement like wages for services performed.' [445 Pa.] at 542, 285 A.2d at 139, as opposed to payments in lieu of compensation, which are made in relief of the claimant's inability to labor. Therefore, the court concluded, the employer was not entitled to credit."
Toborkey, 655 A.2d at 638 (quoted in Ex parte Dunlop Tire Corp., 706 So.2d at 734). As our supreme court noted, the court in Toborkey, supra, denied the employer a setoff because "`the benefits in question were wages for services performed, rather than payments in relief of [the] Claimant's inability to labor.'" Id. (quoting Toborkey, 655 A.2d at 641).
In this case, the evidence indicates that the vacation or holiday pay, and the sick pay, are benefits to which Irby would have *293 been entitled even had he not become disabled; they did not constitute benefits to which Irby became entitled because of his disability. Therefore, given our supreme court's reliance on Toborkey, supra, as a "well-reasoned resolution of some of the questions involved in such a setoff against workers' compensation benefits," we conclude that, under that authority, Fort James was not entitled to a setoff for the benefits it paid Irby for sick pay or for vacation or holiday pay. See Ex parte Dunlop Tire Corp., 706 So.2d at 734.
In its brief on appeal, Fort James asserts that, assuming this court affirms the trial court's judgment in full, the trial court's calculation of the attorney fee for Irby's attorney was correct. However, Fort James requests that this court, if it reverses as to any of the issues Fort James has raised pertaining to setoffs, "remand this case with directions for the trial court to recalculate the attorney fees as well as the compensation." In making that "argument," Fort James urges this court to overrule its recent decision in Bruno's, Inc. v. Killingsworth, 879 So.2d 561 (Ala.Civ.App.2002) (plurality opinion), writ quashed, 879 So.2d 568 (Ala.2003). However, as to the attorney-fee issue, Fort James is not asserting that there is any error in the trial court's judgment that is currently before this court for review. Thus, there is currently no controversy with regard to the calculation of attorney fees before this court, and this court declines to address the attorney-fee "issue" at this juncture.
Fort James last argues that the trial court awarded Irby "unlimited permanent total disability benefits" and that, in doing so, the trial court erred. The provision of the trial court's judgment at issue provides:
"Fort James ... shall, upon the satisfaction of this judgment, be and hereby is released from any and all further liability to [Irby] for workers' compensation benefits by reason of the incidents set out above, except the provisions for future medical benefits and permanent total disability benefits and other benefits as provided by the workers' compensation law of Alabama existing on July 10, 1998."
Fort James contends that the trial court's reference to "other benefits" violates § 25-5-57(a)(4) a., Ala.Code 1975, which provides that benefits may be paid to a worker only during the period of his disability.
In support of its argument as to this issue, Fort James cites Bostrom Seating, Inc. v. Adderhold, 852 So.2d 784 (Ala.Civ.App.2002). In that case, the trial court awarded benefits to the disabled worker for the remainder of the worker's life. This court reversed that portion of the trial court's judgment, concluding that § 25-5-57(a)(4) a. provided that a worker could be awarded benefits only during the time of his or her disability. Bostrom Seating, supra. See also Thompson & Co. Contractors v. Cole, 391 So.2d 1042, 1046 (Ala.Civ.App.1980) (reversing, based upon § 25-5-57(a)(4) a., that part of a judgment awarding a disabled worker benefits "`for and during his natural lifetime'").
In this case, however, the trial court did not award benefits to Irby for periods of time outside of or past the time of his disability. Rather, the trial court specifically stated that any "other benefits" were limited to those provided for in Alabama's Workers' Compensation Act; that Act limits the recovery of workers' compensation benefits to periods of disability. Thus, Fort James has failed to demonstrate error as to this issue.
OPINION OF SEPTEMBER 12, 2003, WITHDRAWN; OPINION SUBSTITUTED; APPLICATIONS FOR REHEARING OVERRULED; AFFIRMED IN *294 PART; REVERSED IN PART; AND REMANDED.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result in part and dissents in part, with writing.
MURDOCK, Judge, concurring in the result in part and dissenting in part.
I dissent as to that portion of the main opinion declining to address the attorney-fee issue at this juncture. I would at this juncture instruct the trial court on remand to recalculate attorney fees based on the benefits to be awarded after the appropriate setoffs are applied. See Bruno's, Inc. v. Killingsworth, 879 So.2d 561, 565 (Ala.Civ.App.2002) (Murdock, J., concurring in part and dissenting in part), writ quashed, 879 So.2d 568 (Ala.2003); Fort James Operating Co. v. Thompson, 871 So.2d 44, 49 (Ala.Civ.App.2002) (Murdock, J., concurring in part, concurring in the result in part, and dissenting in part).
I also dissent as to that portion of the main opinion affirming the trial court's award of "other benefits." Fort James argues on appeal that this award "places an uncertain and vague liability on Fort James" and that this award "may place liability on Fort James without proof that Irby is entitled to `other benefits.'" I agree; I do not know what these "other benefits" would be. Accordingly, I believe the trial court should be instructed to delete the award of undetermined "other benefits" from its judgment.
Except as discussed above, I concur in the result reached by the main opinion.
NOTES
[1] Fort James has asserted in its brief on appeal that the parties made several stipulations before the trial of this matter commenced, including a stipulation that Irby was assigned a 22% impairment rating as a result of his ankle injury. In their briefs to this court, neither party has cited to the record to assist the court in locating those stipulations. The record on appeal is voluminous, and, although this court has carefully reviewed the record, that review did not disclose the stipulation to which Fort James now refers. It is not the function of the appellate court to search the record for evidence that supports an appellant's contentions in its brief on appeal. Jenkins v. Landmark Chevrolet, Inc., 575 So.2d 1157 (Ala.Civ.App.1991).