In this workers' compensation case, Boise Cascade Corporation ("the employer") appeals from a judgment of the Clarke Circuit Court awarding workers' compensation benefits to Tommie L. Jackson ("the employee"). In its judgment, the trial court determined that the employee had sustained a nonscheduled injury that resulted in a permanent total disability and calculated the amount of disability benefits due the employee. On appeal, the employer asserts that the trial court erred in treating the injury as nonscheduled; in considering evidence of vocational disability; and in failing to reduce the disability benefits due by the amount of the employee's attorney's fees. We reverse and remand.
 I.
The material facts pertinent to this appeal show that on October 30, 2001, while in the course of his employment, the employee jumped off a ladder to avoid hot ashes. He landed hard on his left foot on a concrete floor. He heard a crushing noise in his left foot at the time, but he did not experience any immediate pain or other symptoms in any part of his body at the time of his accident.
The next day, Dr. John McAndrew, an orthopedic surgeon, admitted the employee into the hospital. Dr. McAndrew diagnosed the employee with a severely comminuted fracture of the calcaneus, i.e., a broken left heel bone. Because the fracture fragments appeared well-aligned, Dr. McAndrew did not recommend surgery. Instead, he placed a compression bandage on the left heel, splinted the left foot, and prescribed rest, pain medication, elevation *Page 1028 
of the foot, application of ice, and the use of crutches; Dr. McAndrew discharged the employee from the hospital on November 2, 2001.
Dr. McAndrew followed the employee for the next four months. By December 18, 2001, the employee's fracture had healed as expected, so the doctor issued him a walking boot and the employee commenced physical therapy. The treatment significantly improved the employee's range of motion and weight-bearing ability. It also reduced, but did not eliminate, the pain and swelling in the employee's left foot and ankle. Dr. McAndrew placed the employee at maximum medical improvement on March 12, 2002. He assigned a 37% anatomical permanent-impairment rating to the employee's left lower extremity and ordered the employee to undergo work-hardening therapy.
After a period of work hardening, the employee reported back to Dr. McAndrew on April 3, 2002. On that visit, the employee complained of pain not only in his left heel and foot, but also in his back. The employee had experienced previous lower-back problems in 2000 that had resulted in his missing work for three or four months until January 2001. The employee testified that this prior back problem had caused spasms. The employee further testified that following his October 30, 2001, accident, he suffered constant back pain and that the pain was different than his prior back problem.[1]
Dr. McAndrew informed the employee's nurse case manager that he did not believe the back pain was causally related to the left-heel fracture. On May 6, 2002, he wrote the following: "If the back pain was [secondary] to original injury then he would have complained about it at the outset and had ongoing problems. It would not show up as a problem months later." In his deposition, the doctor ex-pounded at length that he did not believe the employee's back complaints were credible or that they related to his foot injury. Accordingly, Dr. McAndrew did not treat the employee's back.
Based on a functional-capacity evaluation conducted on April 11, 2002, Dr. McAndrew established physical and hourly work restrictions for the employee. Thereafter, the doctor reviewed a video-tape made by the employer of a job that the employer believed fit the restrictions set out by Dr. McAndrew. Dr. McAndrew asked to reexamine the employee before releasing him to perform that job. On October 29, 2002, the doctor recorded that he observed the employee walking bare-foot in his office. Dr. McAndrew found no swelling and no antalgic gait.[2] The doctor also recorded that the employee did not complain of pain while walking. Thus, the doctor found no objective evidence to prevent the employee from returning to work in the job depicted on the videotape.
The employee returned to work for the employer on October 30, 2002. Initially, he worked three hours, took a two-to two-and-one-half-hour break, and then worked another three hours, performing the job. The employee complained to Dr. McAndrew on November 22, 2002, that his work activities increased the pain in his left heel and foot. Dr. McAndrew found no objective worsening of the foot, such as swelling, *Page 1029 
on physical examination, so the doctor maintained the same work restrictions. The employee continued working under those restrictions for the next year and a half.[3]
While still working for the employer, the employee underwent an evaluation by Donald Blanton, a licensed professional counselor, on October 28, 2003. The employee informed Blanton that he experienced daily pain in his left heel and in his back. Blanton sent the employee for a physical-work performance evaluation that showed that the employee was "unable to perform" any physical work due to "quite a lot of pain in the left foot and ankle" with increased activities that subsided with stationary activities. The evaluation indicated that the employee was "strong other than his left foot and ankle."
After that evaluation, the employee continued to work for the employer. On May 6, 2004, the employee underwent another functional-capacity evaluation that revealed he could lift in the medium to heavy category of work. During that evaluation, the therapist recorded the employee's complaints of left-foot pain but documented that the employee had stated that his foot was pain-free at rest. Based on that functional-capacity evaluation, Dr. McAndrew increased the employee's work load to eight hours per day. The employee then worked 4 hours in the morning, followed by a 2- to 2 and 1/2-hour break, then worked 4 hours in the afternoon, for the next 10 months.
Dr. McAndrew testified that, for one year, the injury to the employee's heel had extended to the employee's leg because of swelling but that, after that period, the injury had not affected any part of the employee's body other than the area below the employee's left ankle. The impairment rating Dr. McAndrew assigned related solely to the deformity of the calcaneus bone after healing.
Dr. McAndrew testified that a calcaneus fracture is a chronically painful injury. He stated that, even after the bone heals, it leaves scarring in the joint that restricts motion and causes pain. As a result of the fracture, Dr. McAndrew expected that the employee would always have some degree of pain in his left heel and that the pain in the employee's left heel would increase with prolonged standing and walking. As Dr. McAndrew put it, "[t]he pain is proportionate to the amount of stress and strain the bone has to take and how long without rest it has to do it and so forth." The doctor stated that the level of pain the employee would experience would be im-possible to determine. Swelling in the foot is an indicator of pain, but Dr. McAndrew found no objective evidence of swelling due to physical activity during the May 6, 2004, functional-capacity evaluation or in repeated clinical examinations. Nevertheless, he gave the employee the benefit of the doubt that he was experiencing pain due to the nature of his injury.
On March 11, 2005, while still working for the employer, [4]
the employee visited Dr. William Shepherd Fleet, a neurologist. The employee testified that, at that time, he continued to suffer severe pain in his left heel that was so bad he wanted to cry. He stated that his back also hurt while working and that his pain worsened to the *Page 1030 
point he could not take it any more. As a result, he visited a local physician who prescribed Duragesic pain patches and then eventually referred the employee to Dr. Fleet.[5]
The employee told Dr. Fleet that he had been having constant pain in his left heel, left knee, and lower back since the October 30, 2001, accident.[6] The employee related that he had been able to work for the last two and one-half years but that the pain had become unbearable despite the use of heavy narcotic pain medication. Dr. Fleet performed a neurological examination, the result of which were normal except for a patch of decreased sensation in the left heel. Dr. Fleet excused the employee from working, prescribed a variety of new medications, and ordered additional diagnostic testing.
At Dr. Fleet's request, the employee underwent magnetic resonance imaging ("MRI") tests of his lumbar spine and left knee; the results of those tests indicated no abnormalities. A nerve-conduction-velocity test showed no damage to the major nerves of the employee's left leg. From these and other tests, [7] Dr. Fleet determined that the employee had no permanent disability to his left knee and no permanent disability of the lumbar spine. The doctor could not exclude damage to a minor nerve in the left heel, but he testified that even if the employee had such damage it would not impair his function, it would simply cause nondisabling numbness in the left heel.
Dr. Fleet followed the employee for the next three months, during which time he completely weaned the employee off narcotic pain medication. On June 17, 2005, Dr. Fleet released the employee to return to work for 4 hours per day, with 15-minute breaks every hour, along with use of knee and back braces and a cane. Dr. Fleet subsequently filled out the employer's form indicating that the employee could only stand, walk, and work from one to four hours, could only occasionally bend and squat, could never climb stairs or ladders, could not use his left foot for repetitive motion, and should use knee and back braces and a cane. Dr. Fleet testified that he did not intend these restrictions to be permanent; rather, he anticipated that he would liberalize the restrictions after the employee returned to work. The employer could not accommodate these restrictions, however. As a result, the employee did not return to work and the doctor never changed the restrictions.
Dr. Fleet placed the employee at maximum medical improvement on June 23, 2005. He assigned the employee a permanent-impairment rating of 12% to the left lower extremity, which translates to a 5% impairment rating to the body as a whole. This impairment rating was based solely on the pain and residual symptoms resulting from the calcaneus fracture. Dr. Fleet did not assign any impairment rating for the employee's lower-back or his left-knee pain.
In his deposition, Dr. Fleet opined that, based on the employee's history, the employee's *Page 1031 
left-heel injury caused the employee's left-knee and lower-back pain. On direct examination, Dr. Fleet testified that the employee's pain in the left knee and lower back was consistent with an injury from jumping from a height. Later, he testified that he had commonly seen patients develop knee and lower-back pain with foot injuries.
On cross-examination, Dr. Fleet testified that he suspected the employee may have traumatized his left knee in the initial accident but that, because the employee had a normal MRI, any residual left-knee pain resulted from an altered gait. The doctor admitted that he had checked the employee's gait on every visit and had found it to be normal. However, the employee had told the doctor that he would start limping after standing or walking for more than 15 to 30 minutes.
Dr. Fleet also concluded that the employee's back pain emanated from a changed gait following prolonged standing at work. However, after noting that the back pain persisted even after the employee had stopped working, Dr. Fleet admitted that he could not really say whether his theory was correct. Dr. Fleet conceded that Dr. McAndrew was in a better position to determine if the back injury related to the heel injury, although he would not outright defer to Dr. McAndrew's position on the subject.
Dr. Fleet testified that the employee would have to live with his pain but that the pain had been largely mitigated by the employee staving off his feet, taking medication, and using braces. Dr. Fleet agreed that the left-heel pain increases with activity and pressure on the heel.
Just before trial, on September 27, 2005, Blanton performed another confidential evaluation. The employee informed Blanton that he had pain "much of the time." At the time of testing, the employee rated his pain, on a scale of 1 to 10, as a 3 in the left heel and lower back and as 0 in the left knee. The employee indicated that he had experienced pain at a level of 7 out of 10 in his left heel and 5 out of 10 in his left knee and lower back in the preceding 30 days. This was also the worst pain he had felt. The least amount of pain he had felt was a 2 on a scale of 1 to 10 in the left heel and 0 on a scale of 1 to 10 in the left knee and lower back. At trial, Blanton testified that the employee had told him that his left heel was pain-free at rest.
At trial, the employee testified on direct examination that he had constant and severe pain in his left foot and heel, which he rated as a 7 on a scale of 1 to 10 on a typical day when he was not working or using the foot and which he rated as being "off the scale" with increased activity. He testified that he also experienced lesser, but constant, pain in his lower back and left knee. He stated that the left-knee pain causes him to change his gait and that the lower-back pain affects his ability to bend and twist. He testified that he takes pain medication every day, but still experiences pain. He believed his pain level prevents him from working.
On cross-examination, the employee admitted that he had reduced his pain medication intake by two-thirds since he had quit working. The employee denied any statement attributed to him in his medical records in which he reported that he had no foot pain at rest or that he had no complaints of foot pain at times. The employee also admitted that he had worked for over a year and a half after testifying in his deposition that his pain prevented him from working. The employee also testified that his pain level at the time of trial was the same as when he was working. The employee could not explain how he could work for over two years with the *Page 1032 
same level of pain he was now contending prevented him from working.
 II.
Section 25-5-81(e), Ala. Code 1975, sets forth the applicable standard of review in workers' compensation cases:
 "(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
 "(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence."
See also Ex parte Drummond Co., 837 So.2d 831, 832
(Ala. 2002).
 III.
The parties are at issue over whether the employee should receive compensation pursuant to the schedule set out in Ala. Code 1975, § 25-5-57(a)(3) a. and d., for the permanent partial loss of use of his foot or whether his compensation should be based on a nonscheduled permanent total disability under Ala. Code 1975, § 25-5-57(a)(4). The employer argues that the employee sustained a permanent partial disability solely to the left heel. The employee argues that the injury is properly considered as one to the body as a whole because it has caused permanent pain in his left knee and lower back.[8]
The employee alternatively argues that even if the effects of the injury are confined to the left heel, the pain in that scheduled member is so constant, severe, and debilitating that the injury should be treated as an injury to the body as a whole.
 A.
The employer initially argues that the record does not contain substantial evidence indicating that the employee had a back injury. Although the employee complained to Dr. McAndrew and to Dr. Fleet of lower-back pain, neither doctor found damage to the physical structure of the back. Dr. McAndrew did not perform any diagnostic tests to ascertain the source of the employee's back pain because he simply did not believe the employee had hurt his back as a result of the work-related accident. Dr. Fleet ordered a lumbar MRI that showed no signs of physical damage to the lumbar spine. As a result, Dr. Fleet concluded that the employee had no structural abnormalities in the lower *Page 1033 
back that would substantiate a permanent disability to that area. A thorough review of Dr. Fleet's records and his deposition testimony indicates that he did not make any particular diagnosis of the employee's alleged back injury. The employee testified that he experienced pain in his lower back at belt level, but he did not indicate, even in lay terms, that he had suffered an injury to this area, such as a bruise, a knot, a feeling of tightness or looseness, or other similar signs of injury. Therefore, the employer is correct that the employee failed to present substantial evidence of physical damage to his lower back.
The question, however, is whether Alabama law requires damage to the physical structure of other parts of the body in order to take the injury out of the schedule. In Nolan v. ErnestConstruction Co., 243 Ala. 460, 10 So.2d 547 (1942), our Supreme Court, in deciding whether an injury to the lower extremity should be compensated as an injury to the foot or to the leg, declared that the situs of the injury was not determinative of the issue. Rather, "[i]f the injury extends to some other member whose use is thereby impaired, that situation would be material in fixing compensation." 243 Ala. at 463,10 So.2d at 549. The Court resolved that an injury "extends" to another part of the body when it causes injury to the muscles, nerves, ligaments, or other structures of that other part of the body, as distinguished from atrophy due to nonuse.Id. (quoting Ocean Ace. Guar. Corp. v.Harden, 44 Ga.App. 223, 160 S.E. 699, 699 (1931) (case involving injury to heel bone)).
If Nolan represents the current state of the law, the employer would be entitled to a reversal of the judgment because the record contains no evidence of damage to the muscles, nerves, ligaments, or other structures of the employee's back. However, the law is not so clear.
In Bell v. Driskill, 282 Ala. 640, 213 So.2d 806
(1968), overruled in part, Ex parte Drummond Co.,837 So.2d 831 (Ala. 2002), our Supreme Court quoted with approval the following excerpt:
 "`The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive. A common example of this kind of decision is that in which an amputation of a leg causes pain shooting into the rest of the body, general debility, stiffening of the hip socket, or other extended effects resulting in greater interference with ability to work than would be expected from a simple and uncomplicated loss of the leg.'"
282 Ala. at 645, 213 So.2d at 810-11 (quoting 2 Arthur Larson,Workmen's Compensation Law § 58.20). The last sentence from the Larson test implies that an injured worker may recover benefits outside the schedule without proof of actual injury to other parts of the body. So long as the worker proves that the presence of the scheduled injury causes symptoms in other parts of the body, the worker will have proven that the effects of the injury to the member extends to other parts of the body.
The Bell Court did not mention Nolan, however. Moreover, the quotation of the last sentence of the Larson test amounted to no more than dicta because theBell Court did not rest its decision to affirm a nonscheduled disability award on the presence of symptoms in other parts of the body.[9] *Page 1034 
In Leach Manufacturing Co. v. Puckett, 284 Ala. 209,224 So.2d 242 (1969), which was decided the year afterBell, the Court appeared to clarify the appropriate standard for determining whether an injury to a scheduled member extends to another part of the body; the Court stated:
 "Where scheduled benefits are provided for compensation for loss of a member[,] they are not dependent on actual wage loss. . . .
 . . . .
 ". . . [W]here there is an injury resulting in the loss of a member, or the loss of the use of a member, so as to invoke payment of compensation as provided [by the Workers' Compensation Act], and where this is not accompanied by other physical disability (of the body), the payment of the specified sum is intended to fully compensate the injured employee for the injury sustained."
284 Ala. at 214, 224 So.2d at 246-47. Puckett plainly requires proof of bodily injury producing a physical disability to a nonscheduled part of the body as a prerequisite to recovery outside of the schedule.
After Puckett, however, the Supreme Court did not render another decision regarding the proper test for distinguishing between scheduled and nonscheduled injuries for 33 years. In the interim, this court issued numerous opinions using the Bell test that seemed to undermine the holding in Puckett. See Ex parte Drummond Co.,837 So.2d at 834-35 (citing cases applying the Bell test). Although some of those decisions mentioned physical injury to other parts of the body, see Romine v. McDuffie,341 So.2d 952 (Ala.Civ.App. 1977) (permanent shortening of leg that resulted in scoliosis of the back rendered injury nonscheduled), a majority of the cases allowed compensation outside the schedule based solely on symptoms in other parts of the body without referencing a particular injury to the affected body part. See Henderson v. Johnson, 49 Ala. App. 191,269 So.2d 905 (Civ. 1972) (misalignment of employee's legs resulting in pain in his hip, back, and shoulder resulted in nonscheduled disability award); HealthCare Auth. of Huntsville v. Henry, 600 So.2d 324
(Ala.Civ.App. 1992) (knee injury that led to hip and back pain held non-scheduled).
In Ex parte Drummond Co., supra, our Supreme Court once again addressed the proper test for distinguishing between scheduled and nonscheduled injuries. The Court overruledBell to the extent it provided two alternative bases for circumventing the schedule and adopted only the first-prong of the Bell analysis, i.e., the Larson test, which it quoted as follows:
 "`[I]f the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the *Page 1035 
schedule allowance for the lost member is not exclusive.'"
837 So.2d at 834 (quoting 4 Lex K. Larson, Larson'sWorkers' Compensation Law § 87.02 (2001)). Notably, the Supreme Court did not quote the next sentence in the Larson treatise that Bell had quoted. Instead, the Court explained that the test it adopted would be consistent with the holding in Puckett requiring that the injury to the scheduled member be "`accompanied by other physical disability (of the body).'" 837 So.2d at 835.
Since Drummond, this court has considered only one case in which an employee claimed that an injury to the foot should be treated as nonscheduled on the basis of back pain. InFort James Operating Co. v. Irby, 895 So.2d 282
(Ala.Civ.App. 2004), rev'd on other grounds,895 So.2d 294 (Ala. 2004), on remand, 895 So.2d 298
(Ala.Civ.App. 2004), appeal after remand, 911 So.2d 727
(Ala.Civ.App. 2005), a physician testified that the injured worker in that case had strained his lower back at the level of the left sacroiliac joint due to an altered gait following an unsuccessful surgery to his injured ankle. This court affirmed a nonscheduled disability award on the basis that the worker had presented substantial evidence indicating that his ankle injury had caused his lower-back pain.
Other states cited by the Larson treatise as following its test hold that an award of nonscheduled disability benefits is appropriate only if "it is `shown that the scheduled member injury caused a permanent injury to an unscheduled portion of the body.'" Long v. Mid-Tennessee Ford TruckSales, Inc., 160 S.W.3d 504, 511 (Tenn. 2005) (quotingThompson v. Leon Russell Enters., 834 S.W.2d 927, 929
(Tenn. 1992)); see also Wigfall v. Tideland Utils.,Inc., 354 S.C. 100, 106, 580 S.E.2d 100, 103 (2003) (holding that a claimant with a scheduled injury may recover permanent-total-disability benefits outside the schedule by showing "an additional injury"); Secura Ins. v. Labor Industry Review Comm'n, 239 Wis.2d 315, 620 N.W.2d 626
(Ct.App. 2000) (permanent-total-disability award upheld when burns to feet altered gait and led to musculoskeletal complications in injured worker's lower back that were diagnosed as reflex sympathetic disorder and/or complex regional pain syndrome); Madlock v. Square D Co., 269 Neb. 675, 695 N.W.2d 412 (2005) (holding that crush injury to foot that led to chronic and recurrent sacroiliac dysfunction in back due to altered gait should be compensated on basis of loss of earning capacity with no separate award for scheduled benefits).
In Long v. Mid-Tennessee Ford Truck Sales, Inc.,supra, the injured worker alleged that he had suffered injuries to his right foot, right ankle, right leg, and back, and he further alleged that those injuries had resulted in weight gain and sleep apnea. Under Tennessee law, injuries to the foot and leg are scheduled, but injuries to the back are not. The evidence showed that the worker had a prior back problem. The worker had been injured when he felt a sharp pain in his right foot while carrying a heavy automobile part in the course of his employment. The worker eventually underwent fusion surgery on the foot that altered his gait. The worker's physician testified that "`the back, itself, was not injured,'" but that the worker would experience "`difficulties in the back'" from stresses and strains caused by the changes in his foot from the injury. 160 S.W.3d at 508. The trial court treated the worker's injury as a scheduled injury. The worker appealed, arguing that he should have been awarded additional benefits on account of the effects of the injury on his back. The Supreme Court of Tennessee held that in the absence of evidence of an *Page 1036 
injury to the worker's back, mere evidence of back pain and speculative testimony that an altered gait could cause back problems was insufficient to support a finding of disability to the body as a whole. 160 S.W.3d at 511-12.
This case is remarkably similar to Long. As inLong, the evidence is undisputed that the employee in the present case did not suffer an injury to his back. Although the employee had a preexisting back problem, no doctor testified that the employee had aggravated this back problem or had suffered some new strain to the back. Dr. Fleet hypothesized that the employee's back pain emanates from an antalgic gait, but he admitted that he may be wrong and that another physician, who unequivocally denies any relationship between the heel injury and the back pain, would be in a better position to judge whether such a relationship exists. The medical testimony is consistent that the employee has never exhibited an antalgic gait at any clinical examination since Dr. McAndrew determined that he had reached maximum medical improvement on March 12, 2002. The trial court did not document any observations of the employee indicating that he walked with an antalgic gait. Both Dr. McAndrew and Dr. Fleet assigned all the employee's physical disability to his foot injury despite the employee's complaints of back pain. See Ex parteSouthern Energy Homes, Inc., 873 So.2d 1116 (Ala. 2003) (injured worker failed to present substantial evidence indicating that work-related accident caused back injury when physicians could find no objective evidence of back injury and testified only that it was possible, but not likely, that fall led to back pain).
Based on Puckett, Drummond, and the persuasive authority from other jurisdictions cited herein, we hold that the employee may not recover nonscheduled disability benefits in this case on the basis of complaints of back pain in the absence of a showing that the injury to his foot has caused a permanent physical injury to his back.
 B.
The employer next argues that the trial court erred in awarding the employee nonscheduled benefits on the basis of debilitating pain in the left foot. In Master-brand Cabinets, Inc. v.Johnson, 984 So.2d 1136 (Ala.Civ.App. 2005), a plurality of this court affirmed an award of nonscheduled disability benefits to an injured worker due to debilitating pain in her arms and hands. The court basically held that pain isolated to a scheduled member may be sufficient to constitute a disability to the body as a whole if that pain, even when the worker avoids the use of that member to the extent he or she can reasonably do so, is sufficiently abnormal in its frequency or continuity and in its severity. Johnson,984 So.2d at 1145-46.
In Shoney's, Inc. v. Rigsby, 971 So.2d 722
(Ala.Civ.App. 2007), a majority of this court applied theJohnson analysis in denying a claim for nonscheduled disability benefits to a worker who suffered various injuries to both of her arms and hands. This court concluded that the worker's pain was largely precipitated by her use, or overuse, of her arms and hands. The court further held thatJohnson was not binding because the worker, "`by refraining from the use of that member, may largely avoid the pain in question with the result being that the worker is in no worse position due to his inability to use the affected member than if the member had been completely lost.'" Rigsby,971 So.2d at 727 (quoting Johnson, 984 So.2d at 1144).
The employer argues that Johnson and Rigsby
fail to follow the holding in Ex *Page 1037 parte Drummond Co., 837 So.2d at 834 n. 5, in which our Supreme Court overruled those cases holding that pain may take an injury outside the schedule. We need not address this argument because we find that the employee has failed to present substantial evidence indicating that his left-foot pain meets the high standard set out in Johnson andRigsby.
The employee testified that the pain level in his foot has been the same since his accident. At the time of trial, the employee, by his own subjective estimate, experienced typical daily pain at a level of 7 out of 10 in his foot at rest. However, according to medical records, the employee repeatedly informed his therapists and doctors, even those he personally compensated, that he either did not experience pain in his foot or experienced only mild pain in his foot, except with increased activity. The employee did not explain these discrepancies in his statements, other than to deny he made them. See Jackson Landscaping, Inc. v. Hooks,844 So.2d 1267 (Ala.Civ.App. 2002) (worker's testimony that he injured lower back in work-related automobile accident, which contradicted hospital records showing no report of lower-back problem, did not constitute substantial evidence of causation despite worker's assertion that failure of hospital personnel to record lower-back complaints must have been a "misprint").
Dr. Fleet testified that the pain in the employee's foot is "largely mitigated by not staying on his feet and using braces and medication, things of that sort." Dr. McAndrew also testified that the employee's pain would be proportionate to the employee's use of the foot. The employee agreed that his pain would increase — go "off the scale" and make him want to cry — only when he used his foot. As inRigsby, the employee can largely avoid severe pain by refraining from using his foot.
Unlike the injured worker in Johnson, the employee in this case did not present any evidence to indicate that he uses any special pain-control devices or techniques. He did not present any evidence indicating that he has been diagnosed with any unusual pain disorder. Moreover, the employee does not take narcotic pain medication to control his pain. He uses milder forms of pain medication, and he even admitted that he has reduced his intake of pain medication considerably since he has stopped working. Although it is undisputed that the employee has sustained a chronically painful calcaneus fracture, the severity of his pain is not of a type that would take the injury out of the schedule.
For the foregoing reasons, the judgment of the trial court awarding the employee permanent-total-disability benefits outside the schedule set out in § 25-5-57(a)(3) is reversed, and the cause is remanded for the trial court to enter an appropriate award of permanent-partial-disability benefits pursuant to the schedule.
 IV.
Because the employee's injury falls within the schedule, the trial court erred in receiving evidence relating to the employee's loss of earning capacity. See Swift Lumber, Inc.v. Ramer, 875 So.2d 1200, 1205 (Ala.Civ.App. 2003);Smith v. Michelin North America, 785 So.2d 1155, 1158
(Ala.Civ.App. 2000). In scheduled-injury cases, evidence of vocational disability is irrelevant to a proper determination of the compensation due. Smith, 785 So.2d at 1158. Rather, the inquiry is limited solely to a determination of the degree of physical loss or impairment caused by the injury.See Patrick v. FEMCO Southeast, Inc., 565 So.2d 644
(Ala.Civ.App. 1990). On remand, the trial court is instructed to calculate the scheduled disability benefits without consideration of any of the evidence *Page 1038 
of vocational disability, including the testimony of the employee's vocational experts and any evidence relating to the impact of the injury on the employee's ability to obtain employment and earn wages.
 V.
The employer finally asserts that the trial court erred in failing to reduce the award of accrued disability benefits by the amount of the fees awarded to the employee's attorney. The employee does not address this argument in his brief. This court has held that a trial court commits reversible error when it fails to reduce an award of disability benefits by the amount of attorney's fees awarded. Russell Coal Co. v.Williams, 550 So.2d 1007, 1014 (Ala.Civ.App. 1989). In light of the disposition of this case, the trial court is directed to reduce any temporary-total-and permanent-partial-disability benefits awarded by the amount of attorney's fees awarded.
REVERSED AND REMANDED WITH INSTRUCTIONS.
PITTMAN AND THOMAS, JJ., concur.
THOMPSON, P.J., and BRYAN, J., concur in the result, without writings.
[1] The employee also testified that he had reported his back pain to Dr. McAndrew before April 3, 2002, but, according to the employee, the doctor did not document those complaints because he was concerned primarily with the employee's left heel.
[2] An antalgic gait refers to a posture or gait assumed in order to lessen or avoid pain, such as limping or placing more weight on the unaffected foot. See Dorland's IllustratedMedical Dictionary at 747 (30th ed. 2003).
[3] The employee was laid off, along with other employees, when the mill he worked at shut down in December 2002; the employee resumed working in January 2003. The employee received unemployment benefits during the period he was laid off.
[4] The trial of the case originally was scheduled for January 11, 2005, but was continued on motion of the employee. At that time, the employee was working eight-hour days.
[5] The employee did not request a panel of four physicians in order to select an authorized doctor whose services would have been payable by the employer pursuant to § 25-5 77, Ala. Code 1975.
[6] The employee testified that he had complained of left-knee pain since the accident but that his complaints went undocumented. In his deposition, however, the employee indicated that he had injured only his left heel and his back as a result of the work-related accident.
[7] The doctor also ordered arterial Doppler studies of the left leg; the results of those studies showed no abnormal blood flow in that extremity.
[8] Assuming the effects of the left-heel injury extended to the knee, the employee would not be entitled to nonscheduled compensation. In Ex parte Dunlop Tire Corp.,772 So.2d 1167 (Ala. 2000), our Supreme Court ruled that an injury extending from a larger scheduled member to a smaller component of that member, e.g., from an arm to a hand, remained a scheduled injury to be compensated as a loss or loss of use of the larger member. This court also has recently held that if an injury extends from one scheduled member to another scheduled member, the schedule applies if the combination of affected members is covered therein. See Stone WebsterConstr., Inc. v. Lanier, 914 So.2d 869 (Ala.Civ.App. 2005). The reasoning of these cases support the proposition that when an injury extends from a smaller component member to a larger member, the injury should be compensated as a loss or loss of use of the larger member, and not as an injury to the body as a whole. See Simpson v. Dallas Selma Cmty. Action Agency,637 So.2d 1360 (Ala.Civ.App. 1994) (injury extending from left hand to left arm properly compensated as loss of use of left arm).
An injury to the knee is considered a scheduled injury to the leg, see Wolfe v. Dunlop Tire Corp., 660 So.2d 1345
(Ala.Civ.App. 1995), which, of course, is a larger scheduled member of which the foot is a component. Hence, even if the effects of the left-heel injury extend to the left knee, compensation would be fixed by the schedule for a permanent partial loss of use of the leg. Consequently, the opinion will not address further the effects of the injury on the left knee.
[9] The Bell Court adopted a two-pronged test for distinguishing scheduled injuries from nonscheduled injuries:
 "We conclude that although the injury itself is to only one part or member of the body, if the effect of such injury extends to other parts of the body, and produces a greater or more prolonged incapacity than that which naturally results from the specific injury, or the injury causes an abnormal and unusual incapacity with respect to the member, then the employee is not limited in his recovery under the Workmen's Compensation Law to the amount allowed under the schedule for injury to the one member."
282 Ala. at 646, 213 So.2d at 811 (emphasis added). The facts of the case showed that the injured worker in Bell had not experienced any physical symptoms from his knee injury outside of his leg. Rather, his knee injury caused significant pain, swelling, and instability in his leg that rendered him unable to work even with the use of a heavy knee brace. Hence, the decision to affirm the nonscheduled award rested on the second prong of the Bell test. That prong of theBell test has since been overruled by the Supreme Court in Ex parte Drummond Co., 837 So.2d 831 at 835
n. 10.