996 So.2d 833 (2008)
FORT JAMES OPERATING COMPANY, INC.
v.
William J. STEPHENS.
1061001.
Supreme Court of Alabama.
May 30, 2008.
*834 Terry A. Moore of Austill, Lewis, Simms, Pipkin & Moore, Mobile; brief on application for rehearing filed by William E. Pipkin, Jr., of Austill, Lewis & Pipkin, P.C., Mobile, for appellant.
Max Cassady, Fairhope; and William L. Utsey of Utsey & Utsey, Butler, for appellee.

On Application for Rehearing
BOLIN, Justice.[1]
This court's opinion of November 30, 2007, is withdrawn, and the following is substituted therefor.
William J. Stephens sued his employer, Fort James Operating Company, Inc. ("Fort James"), on March 15, 2001, seeking to recover worker's compensation benefits for injuries he allegedly suffered to his right knee and his neck during the course of his employment with Fort James. Fort James answered the complaint on April 24, 2001, admitting that Stephens suffered an injury to his right knee during the course of his employment but denying that the knee injury caused Stephens to suffer a permanent injury, lost work time, or lost wages or that it required surgery. In its answer, Fort James also denied that Stephens had suffered a neck injury during the course of his employment. Additionally, Fort James asserted certain affirmative defenses, including a setoff for the salary paid to Stephens during the benefit period.
Following an ore tenus proceeding, the trial court, on November 9, 2005, entered an order finding that Stephens had suffered a 35% permanent partial disability to the whole body as the result of the injuries to his knee and neck; awarded Stephens worker's compensation benefits in the amount of $60,312; awarded Stephens's attorney an attorney fee of $9,046.80; and taxed costs to Fort James.
On December 7, 2005, Stephens moved the trial court to amend its judgment to include a finding of the dates Stephens reached maximum medical improvement ("MMI") for the injuries to his knee and neck. On December 8, 2005, Fort James moved the trial court to amend its judgment, alleging that the order contained factual errors and errors in legal reasoning. The trial court granted Stephens's postjudgment motion by amending its order and finding that Stephens had reached MMI for the knee injury on December 8, 1999, and for the neck injury on March 23, 2000. Fort James's postjudgment motion was denied by operation of law on March 8, 2006; Fort James appeals.

*835 Standard of Review

In a worker's compensation case, the appellate court reviews the "standard of proof ... and other legal issues without a presumption of correctness." § 25-5-81(e)(1), Ala.Code 1975; see also Ex parte Professional Bus. Owners Ass'n Workers' Comp. Fund, 867 So.2d 1099, 1102 (Ala. 2003). A trial court's judgment in a worker's compensation case based on pure findings of fact will not be reversed if it is supported by substantial evidence. § 25-5-81(e)(2), Ala.Code 1975. "[W]e will not reverse the trial court's finding of fact if that finding is supported by substantial evidence  if that finding is supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., Inc., 680 So.2d 262, 268-69 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). "Therefore, in such a case the appellate court must view the facts in the light most favorable to the findings of the trial court." Ex parte Professional Bus. Owners Ass'n Workers' Comp. Fund, 867 So.2d at 1102. "Moreover, the Court of Civil Appeals observed in Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995), that `the [1992 Workers' Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court."' Ex parte Phenix Rental Ctr., 873 So.2d 226, 229 (Ala.2003).

Facts
At the time of the accident giving rise to this complaint, Stephens was 59 years old and had been employed by Fort James and its predecessors for approximately 40 years; his average weekly earnings were $1,307.58. On November 6, 1997, while working in his position as a "crew trainer," Stephens slipped in a patch of oil and "hyperextended" his right knee. Stephens completed his shift and did not report the accident at that time. However, Stephens's right knee became swollen and painful overnight, prompting him to report the accident to his supervisor the following day. Stephens received first-aid treatment from Fort James, but his knee continued to be symptomatic, and he was referred by Fort James to Dr. Terry French for evaluation.
Stephens was first seen by Dr. French on January 16, 1998, complaining of pain and a popping sensation in the knee when he engaged in activities such as squatting, bending, and climbing. Dr. French examined Stephens's knee and concluded that he had a possible torn medial meniscus ligament. Although Dr. French placed Stephens's knee in a support, prescribed anti-inflammatory medication, and restricted Stephens from climbing ladders, Stephens otherwise was released by Dr. French to full activity.
Dr. French continued to treat Stephens's knee conservatively, including injections of anti-inflammatory medication. Stephens was seen by Dr. French on February 2, 1998, complaining of tenderness in the knee with activities. Dr. French noted at that time that Stephens had a full range of motion in the knee with tenderness over the anserine bursa. Dr. French concluded that Stephens did not have a torn medial meniscus ligament but, rather, that he suffered from bursitis in the knee. Stephens returned to Dr. French on February 12, 1998, and reported that although he had had complete relief from the knee pain following the injections, the pain had slowly begun to recur. Dr. French noted that Stephens had a full range of motion in his knee and that there was no swelling and only localized tenderness over the anserine bursa. Dr. French again injected the knee *836 with anti-inflammatory medication, continued Stephens on limited work duty for 10 days, and told him that if he had any further problems with the knee Dr. French would refer him to a orthopedist.
While Stephens was being treated by Dr. French he did not miss any time from work, and he was able to perform all the duties associated with his job. After Stephens was released by Dr. French, he did not miss any time from work because of his knee, and he performed his job without restrictions.
Stephens did not see Dr. French again until he returned on January 22, 1999, with continued complaints of pain in his right knee. Dr. French examined Stephens's knee and noted some swelling and tenderness over the anterior medial aspect of the knee. Dr. French referred Stephens to Dr. Gus A. Rush III, an orthopedic surgeon. Stephens was first seen by Dr. Rush on January 26, 1999. Dr. Rush examined Stephens's knee and suspected that he had a torn medial meniscus ligament. He recommended diagnostic arthroscopic surgery to confirm the diagnosis and to repair the knee. On April 5, 1999, Dr. Rush performed arthroscopic surgery on Stephens's knee and confirmed a partial tear of the medial meniscus ligament as well as a complete tear of the anterior cruciate ligament. Dr. Rush repaired both tears.
Stephens returned to Dr. Rush on April 13, 1999. Dr. Rush noted that at that time Stephens was doing well with a full range of motion and more stability in the knee than he had had before the surgery. Stephens had been provided crutches following his knee surgery, and Dr. Rush noted that Stephens should "wean [himself] from the crutches." Dr. Rush also fitted Stephens for a knee brace and prescribed physical therapy.
Stephens testified that on April 13, 1999, as he was entering his house, the left crutch slipped off the steps, causing him to jam his right shoulder in an upward motion. Stephens stated that he experienced a burning and stinging sensation in the right side of his neck. Approximately two weeks later, Stephens's left crutch again slipped while he was entering the first-aid station at Fort James, causing his right shoulder again to be jammed in an upward motion. He testified that he again experienced a burning sensation in the right side of his neck.
Stephens had suffered from arthritis in his neck since 1987. Stephens stated that arthritis pain would radiate through his right shoulder into his forearm and cause numbness in his right hand. Stephens had previously been treated for the arthritic condition in his neck, including being prescribed medication, and he stated that the symptoms would always resolve. However, he testified that the symptoms in his neck have intensified and persisted since the two incidents involving the crutches.
Stephens returned to Dr. Rush on May 4, 1999. Dr. Rush noted that Stephens's knee was doing well and that he had a full range of motion in the knee. Dr. Rush continued Stephens's physical therapy and recommended that he not wear the knee brace inside his house. Dr. Rush also noted at that time that Stephens reported a flare-up of the arthritis in his neck with pain radiating into his shoulder and arm. Upon examination, Dr. Rush noted irritation of the C-5 nerve root on the right side and a limited range of motion in the cervical spine. Dr. Rush recommended an injection of anti-inflammatory medication and referred Stephens to a neurosurgeon.
Stephens was seen on May 18, 1999, by Dr. John C. Neill, a neurosurgeon, for his neck and right-shoulder complaints. Stephens related to Dr. Neill that approximately *837 one week after his knee surgery he began experiencing pain in his right shoulder that radiated into his right arm. Stephens told Dr. Neill that he could tilt his head to the left and would then have almost total relief from his symptoms. He also told Dr. Neill that the pain was not constant. Following his examination, Dr. Neill noted that Stephens had some weakness in his right triceps muscle and diminished right triceps reflex. Dr. Neill concluded that Stephens's pattern of pain and weakness would suggest a C-7 nerve-root syndrome. Dr. Neill noted that the condition could resolve spontaneously and that the best course of action was observation. He told Stephens to return in three weeks for a follow-up visit.
Stephens returned to light-duty work at Fort James on May 25, 1999, with the following restrictions: no squatting, kneeling, climbing, lifting over 25 pounds, or long-distance walking. Although Stephens was on restricted duty he returned to his regular job and he was earning his regular wage. Stephens continued to receive physical therapy for his knee as prescribed by Dr. Rush but did not receive any physical therapy for his neck. Earlier in his physical therapy Stephens had reported to his therapist that the therapy for his knee was aggravating his neck and arm pain. On June 3, 1999, Stephens's physical therapist noted that his neck and arm complaints were better.
Stephens did not return to Dr. Neill as scheduled three weeks after his first visit; rather, Lynn Love, Stephens's case manager, telephoned Dr. Neill's office on June 7, 1999, and stated that Stephens's neck symptoms had resolved and that he would not be returning for a follow-up visit. Dr. Neill testified that, based on the information his office had received from Love, the date of MMI for Stephens's neck was June 7, 1999, and Stephens had no permanent impairment from the injury. Stephens denied that his neck and arm symptoms had resolved; he testified that he canceled the appointment with Dr. Neill because he did not like Dr. Neill's attitude and because it was an excessively long drive to Dr. Neill's office.[2]
Stephens returned to Dr. Rush on July 16, 1999, for a follow-up visit for his knee. Dr. Rush noted that overall Stephens was doing well with the knee. Dr. Rush continued Stephens on light-duty work for four to six weeks. Stephens was released from physical therapy for his knee on August 19, 1999, with the therapist noting at that time that Stephens had a full range of motion and normal strength levels in the knee. Stephens returned to Dr. Rush for a final visit on September 14, 1999. Dr. Rush noted at that time that the anterior cruciate ligament was stable and that overall Stephens was doing well with his knee. Dr. Rush further noted that Stephens should refrain from using the knee brace except for strenuous activities and returned him to regular-duty work limited only to 12-hour shifts for 2 months. Dr. Rush assigned Stephens a permanent-impairment rating of 5% to 8% for the knee and stated that he would reach MMI on October 14, 1999.
After Stephens was released by Dr. Rush, he wanted a second opinion as to his knee, so Fort James provided him with a panel of four physicians; he chose Dr. Steven R. Nichols, an orthopedic surgeon. Stephens was first seen by Dr. Nichols on November 4, 1999. Dr. Nichols noted that Stephens's knee was tender, swollen, and unstable. His impression was that Stephens suffered from post-anterior cruciate-reconstruction instability and post-traumatic arthritis. Dr. Nichols prescribed *838 anti-inflammatory medication, ordered strength and stability tests for the knee, and continued Stephens on light-duty work. The stability test indicated that Stephens had "good" stability in the knee and the strength test placed Stephens in the 74th percentile as his knee strength related to the rest of the population.
Stephens had questioned Dr. Nichols about his ability to return to full-duty work at Fort James, so Dr. Nichols ordered a functional-capacities evaluation, which was performed on November 30, 1999. Stephens returned to Dr. Nichols on December 8, 1999, for the results of the functional-capacities evaluation. Based on the results of the functional-capacities evaluation, Dr. Nichols released Stephens to return to full-duty work with restrictions of no lifting anything over 60 pounds and no prolonged squatting or crawling. Dr. Nichols determined that Stephens had reached MMI with his knee at that time. He assigned Stephens a permanent-impairment rating of 5% to the knee.
In January 2000, Fort James phased out Stephens's position as a "crew trainer" and transferred him to the "machine tender" position. He was able to perform the full duties of the "machine tender" position within the restrictions assigned by Dr. Nichols. Stephens earned a slightly higher weekly wage as a "machine tender" than he did as a "crew trainer."
On March 8, 2000, Stephens returned to Dr. Nichols with continued complaints of pain in his neck that radiated into his right shoulder and arm.[3] Stephens related to Dr. Nichols on this visit the two incidents involving the crutches and told him that his symptoms had persisted since that time. On examination, Dr. Nichols was able to reproduce pain with hyperflexion of the neck that was relieved by rotating the head to the left. X-rays were taken; the X-rays revealed arthritis at the C-5, C-6, and C-7 vertebrae levels. Dr. Nichols prescribed anti-inflammatory medication and ordered a cervical myelogram and CT scan.
Stephens returned to Dr. Nichols on March 23, 2000. Dr. Nichols noted at that time:
"[Stephens] had a cervical myelogram and CT scan this morning which reveals a considerable spondylosis with a foraminal stenosis bilaterally at [the C-4-5, C-5-6, and C-6-7 vertebrae levels] with compression of the fifth, sixth and seventh nerve roots. He tells me that the Celebrex [brand non-steroidal anti-inflammatory drug] seems to be helping a good deal, eliminating some of the cramping and shocking sensation. He still has some residual soreness at the base of the neck. I would suggest that we continue with the Celebrex for now. In addition, we have given him a few Ultram [brand pain reliever] for more severe pain.... [F]or all practical purposes, he is at MMI with regards to his cervical spine. We will plan to follow up as necessary."
Stephens was next seen by Dr. Nichols on September 14, 2000, with continued *839 complaints of pain in his neck and right arm. Dr. Nichols continued Stephens on the anti-inflammatory medications and referred him for a new functional-capacities evaluation and impairment rating. Following the functional-capacities evaluation, Stephens was assigned a permanent-partial-impairment rating of 15% for the neck. Dr. Nichols testified that Stephens's neck condition would quite possibly continue to deteriorate to the point that he would eventually require surgery.
Stephens continued to work at Fort James, receiving his regular wage, until he retired on November 29, 2000. Stephens was able to perform the duties of his job as a "machine tender" under the restrictions prescribed by Dr. Nichols. However, he testified that he eventually lost the grip strength in his right hand and that he could no longer make the manual adjustments to the machine as required and could no longer climb or balance himself on the machine because of his knee injury.

Discussion
Fort James argues that the trial court erred in finding that March 23, 2000, was the date Stephens reached MMI for his neck injury. Specifically, Fort James contends that Stephens's neck injury had stabilized by June 7, 1999, and that all medical treatment involving the neck from that point forward was merely diagnostic in nature. Thus, Fort James contends that the actual date of MMI for Stephens's neck injury was June 7, 1999.
The Court of Civil Appeals has stated:
"It is well settled that in order for an employee to recover permanent partial or permanent total disability benefits the employee must have reached MMI. Ex parte Phenix Rental Ctr., 873 So.2d 226 (Ala.2003); Hillery v. MacMillan Bloedel, Inc., 717 So.2d 824 (Ala.Civ. App.1998); Edward Wiggins Logging Co. v. Wiggins, 603 So.2d 1094 (Ala.Civ. App.1992); Pemco Aeroplex, Inc. v. Johnson, 634 So.2d 1018 (Ala.Civ.App. 1994); and Alabama By-Products Corp. v. Lolley, 506 So.2d 343 (Ala.Civ.App. 1987). A claimant has reached MMI when `there is no further medical care or treatment that could be reasonably anticipated to lessen the claimant's disability.' G.UB.MK. Constructors v. Traffanstedt, 726 So.2d 704, 709 (Ala.Civ. App.1998). When MMI is reached depends on the circumstances of the particular case. Hillery v. MacMillan Bloedel, Inc., supra; Pemco Aeroplex, Inc. v. Johnson, supra."
Halsey v. Dillard's, Inc., 897 So.2d 1142, 1148 (Ala.Civ.App.2004). "While the treating physicians generally provide the best evidence concerning maximum medical improvement, the trial court is not bound by their opinions in assigning the date of maximum medical improvement." 1 Terry A. Moore, Alabama's Workers' Compensation § 13:6 (1998) (footnote omitted). See also Guardian Cos. v. Kennedy, 603 So.2d 1053 (Ala.Civ.App.1992).
The evidence indicates that Dr. Neill determined that Stephens had reached MMI on June 7, 1999, based on information received by the case manager informing him that Stephens's neck symptoms had resolved and that Stephens was canceling his follow-up appointment. However, Stephens denied that his symptoms had resolved and stated that he had canceled the appointment because he did not like Dr. Neill and because his office, located in Jackson, Mississippi, was too far away for Stephens to drive. Rather, Stephens testified that his neck symptoms persisted. When Dr. Nichols examined Stephens on March 8, 2000, he was able to reproduce pain with hyperflexion of the neck. X-rays indicated that Stephens had arthritis at the C-5, C-6, and C-7 vertebrae levels. A *840 cervical myelogram and CT scan revealed considerable arthritis with foraminal stenosis and nerve-root compression at the C-4-5, C-5-6, and C-6-7 vertebrae levels. Dr. Nichols had prescribed anti-inflammatory and pain medication for Stephens. Dr. Nichols, an authorized treating physician, determined that Stephens had reached MMI on March 23, 2000. More importantly Dr. Nichols testified that Stephens's condition would quite possibly continue to deteriorate to the point that he would require surgery. See Sunshine Jr. Stores, Inc. v. Dower, 625 So.2d 445 (Ala. Civ.App.1993) (holding that the trial court could find MMI even though employee had not been offered surgery that might lessen her disability).
As stated above, it is not this Court's role to reweigh the evidence on appeal. After reviewing the record in this case, we conclude that substantial evidence exists from which the trial court could have concluded that Stephens did not reach MMI until March 23, 2000.
Fort James next argues that the trial court erred in failing to offset, pursuant to § 25-5-57(c)(3), Ala.Code 1975, the worker's compensation benefits it owes Stephens by the 48 weeks of regular wages it paid Stephens during the period of December 8, 1999, the date of MMI of the knee injury, through November 29, 2000, the date stipulated to as Stephens's retirement date.[4] Section 25-5-57(c)(3), Ala. Code 1975, provides that if an employee receives a salary "during the benefit period... the employer shall be allowed a setoff in weeks against the compensation owed under this article." In order for an employee to receive permanent-partial or permanent-total-disability benefits, the employee must have reached MMI. Ex parte Phenix Rental Ctr., supra.
The trial court awarded Stephens permanent-partial-disability benefits at a rate of $220 per week for 300 weeks. The trial court did not compensate Stephens's knee injury and neck injury separately; rather, it found that Stephens had suffered a 35% permanent partial disability based on a combination of the injuries. Fort James again contends that Stephens reached MMI for his neck injury on June 7, 1999, and that he reached MMI for his knee injury on December 8, 1999. Therefore, Fort James argues that the latest Stephens reached MMI for the combined injuries was December 8, 1999, and that by statute it is entitled to a credit for the 48 weeks of wages it paid Stephens from December 8, 1999, through November 29, 2000.
As stated above, substantial evidence exists to support the trial court's finding that Stephens did not reach MMI as to his neck injury until March 23, 2000. Therefore, under Fort James's reasoning, March 23, 2000, is the date Stephens reached MMI for the combined injuries. The record indicates that Stephens was paid his regular wage from March 23, 2000, until he retired on November 29, 2000. Accordingly, we conclude that Fort James is entitled to offset the benefits it owes Stephens by the number of weeks Fort James paid Stephens's wages during the period of March 23, 2000, through November 29, 2000.[5]
Relying on § 25-5-89, Ala.Code 1975, Fort James next argues that the trial *841 court erred in awarding Stephens costs. Section 25-5-89, Ala.Code 1975, provides:
"Costs may be awarded by said court in its discretion, and, when so awarded, the same costs shall be allowed, taxed and collected as for like services and proceedings in civil cases, but if it shall appear that the employer, prior to the commencement of the action, made to the person or persons entitled thereto a written offer of compensation in specific terms, which terms were in accordance with the provisions of this article and Article 2 of this chapter, then no costs shall be awarded or taxed against such employer."
Fort James offered to pay Stephens benefits at a rate of $183.05 for 287 weeks, which offer was contained in an "Agreement and Petition for Approval of Settlement" signed by Stephens on March 12, 2001. Stephens filed his worker's compensation complaint on March 15, 2001. Fort James contends that had Stephens accepted its offer he would have received $52,535.35 in benefits and that that amount exceeds the $49,752 in benefits that Fort James says Stephens is actually entitled to receive in this case. Therefore, Fort James argues that the trial court erred in taxing costs of $6,915.11 against it.
The $52,535.35 in benefits Fort James says Stephens would have received under the settlement agreement is based on benefits of $183.05 per week for 287 weeks ($183.05 × 287 = $52,535.35).[6] The sum of $49,752 in benefits Fort James claims Stephens is actually entitled to receive is based on a MMI date of December 8, 1999, which equates to a 48-week credit against the maximum benefit period of 300 weeks. Thus, Fort James reaches the sum of $49,752 based on a weekly benefit of $220 for 252 weeks (300 weeks less the 48-week credit) with a credit of $5,688 to Fort James for temporary-total-disability benefits paid to Stephens ($220 × 252  $5,688 = $49,752).
As discussed above, however, the evidence supports the trial court's finding that Stephens reached MMI on March 23, 2000. The record indicates that Fort James paid Stephens a regular wage for 35 weeks during the period of March 23, 2000, through November 29, 2000.[7] Therefore, *842 the disability benefits owed Stephens are figured on a wage credit of 35 weeks to Fort James rather than 48 weeks. A weekly benefit of $220 for 265 weeks (300 weeks less the 35-week credit) with a credit of $5,688 to Fort James for temporary-total-disability benefits paid to Stephens results in $52,612 in benefits that Stephens is actually entitled to in accordance with the provisions of the Workers' Compensation Act ($220 × 265  $5,688 = $52,612). Although the total amount of compensation contained in Fort James's written offer differed only slightly from the benefits Stephens is actually entitled to receive under the Workers' Compensation Act, the amounts nevertheless differed and thus cannot be said to be "in accordance *843 with the provisions" of the Act. § 25-5-89, Ala.Code 1975. Therefore, we cannot say that the trial court exceeded its discretion in awarding costs to Stephens.
Stephens argues in his application for a rehearing that this Court misapprehended the setoff provision found in § 25-5-57(c)(3), Ala.Code 1975, which provides:
"(3) If an employer continues the salary of an injured employee during the benefit period or pays similar compensation during the benefit period, the employer shall be allowed a setoff in weeks against the compensation owed under this article. For the purposes of this section, voluntary contributions to a Section 125-cafeteria plan for a disability or sick pay program shall not be considered as being provided by the employer."
Stephens contends that the "salary" discussed in § 25-5-57(c)(3) refers to a "sympathy" salary paid to an injured employee who is not working and, therefore, not earning his salary but is being paid because the employer anticipates workers' compensation liability and does the right thing by continuing to pay the employee. Stephens cites the following:
"`If a man is giving a dollar's worth of labor for every dollar he is paid, the intention of the employer cannot be said to be that of supplying a substitute for workmen's compensation; it is simply to purchase these services from this man on the same terms as from any other man. Therefore, credit is usually disallowed when it can be shown that the claimant earned the wages he was paid during the period in question."'
Stephens's rehearing brief at 5 (quoting 2 Arthur Larson, Workmen's Compensation Law § 57.42).[8] Stephens states that he returned to work and earned his salary and that he was not paid a "sympathy" salary. Thus, he argues that Fort James was not entitled to a setoff pursuant to § 25-5-57(c)(3).
Fort James first raised the issue of setoff in its postjudgment motion. Stephens offered nothing in response to the issue. Subsequently, Fort James renewed its postjudgment motion and requested that the matter be set for a hearing. Again, Stephens offered nothing in response to the setoff issue. It appears from the record that Fort James's postjudgment motion was set for a hearing on March 16, 2006, but was denied by operation of law on March 8, 2006. Fort James raised the issue of setoff in its appellate brief and fully argued the matter before this Court. Stephens failed to address or to refute Fort James's argument as to setoff, except to say that the issue "should already have been resolved" by the resolution of the issue regarding the date Stephens reached MMI.
Stephens has raised for the first time on application for rehearing his argument that this Court misapprehended the setoff provision in § 25-5-57(c)(3), Ala. Code 1975, by granting Fort James a setoff for wages Stephens earned through actual labor, not by way of a "sympathy" salary paid by Fort James because of Stephens's injury and inability to work. "`The well-settled rule of this Court precludes consideration of arguments made for the first time on rehearing.'" Riscorp, Inc. v. Norman, 915 So.2d 1142, 1155 (Ala. 2005) (opinion on application for rehearing) (quoting Water Works & Sewer Bd. of Selma v. Randolph, 833 So.2d 604, 608 (Ala.2002)). Accordingly, because Stephens attempts to raise this particular argument for the first time in his application *844 for rehearing, we cannot consider it. Because this is an important issue in the area of workers' compensation law that does not appear to have been definitively addressed by this Court, we will await a proceeding in which this issue is both squarely before this Court for adjudication and adequately briefed.

Conclusion
We affirm the trial court's judgment to the extent it found March 23, 2000, to be the date of MMI and taxed costs against Fort James. We reverse the judgment to the extent it failed to allow Fort James a wage credit for regular wages paid to Stephens for the period of March 23, 2000, through November 29, 2000.
APPLICATION OVERRULED; OPINION OF NOVEMBER 30, 2007, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
COBB, C.J., and LYONS, WOODALL, STUART, and SMITH, JJ., concur.
PARKER, J., concurs in part and dissents in part.
SEE and MURDOCK, JJ., concur to overrule the application for rehearing and otherwise dissent.
PARKER, Justice (concurring in part and dissenting in part).
I concur in the main opinion except as to that part affirming the trial court's taxation of costs against Fort James Operating Company, Inc., the employer. I respectfully dissent from that part. I view the offer made by Fort James as containing terms in accordance with the Workers' Compensation Act, in which case "no costs shall be awarded or taxed against [the] employer." § 25-5-89, Ala.Code 1975.
MURDOCK, Justice (concurring to overrule the application for rehearing and otherwise dissenting).
I concur in overruling William J. Stephens's application for rehearing. As to the majority opinion, however, I dissent for the reasons hereinafter stated.
The testimony by William J. Stephens and the medical evidence indicates that there was no change in Stephens's neck condition from June 7, 1999, to March 23, 2000. The fact that Stephens's condition "persisted" at the same level at which it existed on the earlier date is inconsistent with the notion that it was improving to the point of finally reaching "maximum medical improvement" ("MMI") on the latter date.
Dr. Nichols's notes do not state that Stephens reached MMI on March 23, 2000. Dr. Nichols, who did not treat Stephens for his neck problem between June 1999 and March 2000, simply explained in his March 23, 2000, notes that he had prescribed an anti-inflammatory drug for Stephens two weeks earlier on March 8 and that "[Stephens] is at MMI with regard to his cervical spine." (Emphasis added.) In the context of the other undisputed evidence of Stephens's neck problem simply "persisting" without change from June 7, 1999, to March 23, 2000, I cannot consider Dr. Nichols's bare statement that Stephens was at MMI when Dr. Nichols saw him in March as substantial evidence that Stephens did not reach MMI until March.
I recognize that the anti-inflammatory medication prescribed for Stephens by Dr. Nichols during his March 8 visit did provide Stephens with some relief. As Professor Larson explains, however, the proper focus is on the underlying condition, which did not change for this employee between June 7, 1999, and March 23, 2000:

*845 "The issue [of when MMI has been reached] may be purely a medical one. Thus, there may be medical evidence that the period of recuperation is not yet over, that further healing and strengthening may be anticipated, and that it is still too early to appraise claimant's permanent disability. Conversely, there may be medical testimony that the claimant has recovered as much as he or she ever will, and that any lingering disability is permanent. The fact that some treatment is still necessary, such as physical therapy or drugs, does not necessarily rule out a finding that the condition has become stabilized, if the underlying condition causing the disability has become stable and if nothing further in the way of treatment will improve that condition."
4 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 80.03[3] (2007) (footnotes omitted). Judge Moore, in his treatise on Alabama workers' compensation law, states: "[T]he mere fact that the employee may receive some palliative benefit from further medical attention that is not designed to reduce the physical disability does not prevent a court from finding that the employee has reached maximum medical improvement." 1 Terry A. Moore, Alabama Workers' Compensation § 13:6 (1998) (footnote omitted). See also G.UB.MK. Constructors v. Traffanstedt, 726 So.2d 704, 709 (Ala.Civ.App.1998) (the date of MMI is "the date on which the claimant has reached such a plateau that there is no further medical care or treatment that could be reasonably anticipated to lessen the claimant's disability").
Based on the foregoing, I respectfully dissent. I would reverse the trial court's judgment to the extent that it found March 23, 2000, to be the date of MMI for Stephens's neck injury. I would remand the cause for the trial court to enter a judgment setting MMI at June 7, 1999, and applying an appropriate wage credit to the permanent-partial-disability benefits due Stephens in relation to the wages paid Stephens by Fort James from and after that date.
SEE, J., concurs.
NOTES
[1] Before taking office as a judge on the Alabama Court of Civil Appeals in January 2007, Judge Terry Moore served as counsel for Fort James Operating Company, Inc., while this action was pending in the trial court. Therefore, on April 13, 2007, the Court of Civil Appeals transferred the case to this Court pursuant to § 12-3-15, Ala.Code 1975.
[2] Dr. Neill's office is located in Jackson, Mississippi.
[3] Even though Stephens had been seen by several health-care professionals on numerous occasions between June 1999 and March 2000, there were no documented complaints of neck and arm pain. However, Stephens testified that he had continuous neck and right-arm pain since the incidents involving the crutches in April 1999 and that he did not mention his neck complaints on those occasions because he was not being treated by those individuals for his neck symptoms. Dr. Nichols testified that Stephens may have mentioned his neck complaints to him before March 8, 2000, but that, if he did, Dr. Nichols stated that he discouraged Stephens from talking about it, choosing to focus only on the knee symptoms.
[4] The period between December 8, 1999, and November 29, 2000, is closer to 50 weeks; however, this period included two weeks in which Stephens was on unpaid vacation and received no wages from Fort James.
[5] See note 7, infra.
[6] This sum is based on the clear terms of the settlement agreement. The settlement agreement did not address the $5,688 credit Fort James is entitled to receive for temporary-total-disability benefits paid to Stephens. If the credit is applied to the amount arrived at by the settlement agreement, the settlement would actually equal $46,847.35.
[7] The record indicates that Stephens received a week of paid vacation from Fort James the work week ending Friday, August 4, 2000. This week was not counted toward the wage credit given to Fort James, thus resulting in a 35-week-wage credit being given to Fort James rather than a 36-week-wage credit. In Fort James Operating Co. v. Irby, 895 So.2d 282 (Ala.Civ.App.2004), Fort James expressly argued that it was entitled to a credit pursuant to § 25-5-57(c)(1) and (3) for sickness and accident benefits and vacation and holiday paid to the employee. In denying Fort James the setoffs, the Court of Civil Appeals stated:

"The effect of the trial court's refusal to allow Fort James a credit for its payment of vacation or holiday pay and sick pay to Irby is that Irby received that compensation in addition to receiving workers' compensation benefits for the same time periods. Our supreme court has stated that the Alabama Legislature's intent in enacting its 1992 amendments to the Alabama Workers' Compensation Act was, in part, to prevent a workers' compensation claimant from receiving a `double recovery' such as occurs when the claimant is paid both workers' compensation benefits and other benefits `that a worker might receive as a result of an injury.' See Ex parte Taylor, 728 So.2d [635] at 637 [(Ala. 1998)] (stating that a worker could not receive both workers' compensation benefits and payments from a disability plan or a sick-pay plan paid as a result of an injury for the same time period).
"However, as to the issues whether an employer is entitled to a credit for vacation or holiday pay and sick or accident pay, our supreme court has quoted with approval a Pennsylvania case that denied a setoff for those types of pay. See Ex parte Dunlop Tire Corp., [706 So.2d 729 (Ala. 1997)], citing Toborkey v. Workmen's Comp. Appeal Bd. (H.J.Heinz), 655 A.2d 636 (Pa. Commw.Ct. 1995). In explaining the rationale for its denial of that setoff, the Pennsylvania court stated:
"`The Supreme Court noted in Temple [v. Pennsylvania Dep't of Highways, 445 Pa. 539, 285 A.2d 137 (1971),] that sick leave, like vacation pay, was "an incident or benefit provided under the work agreement and is an entitlement like wages for services performed." [445 Pa.] at 542, 285 A.2d at 139, as opposed to payments in lieu of compensation, which are made in relief of the claimant's inability to labor. Therefore, the court concluded, the employer was not entitled to credit.'
"Toborkey, 655 A.2d at 638 (quoted in Ex parte Dunlop Tire Corp., 706 So.2d at 734). As our supreme court noted, the court in Toborkey, supra, denied the employer a setoff because "`the benefits in question were wages for services performed, rather than payments in relief of [the] Claimant's inability to labor."' Id. (quoting Toborkey, 655 A.2d at 641).
"In this case, the evidence indicates that the vacation or holiday pay, and the sick pay, are benefits to which Irby would have been entitled even had he not become disabled; they did not constitute benefits to which Irby became entitled because of his disability. Therefore, given our supreme court's reliance on Toborkey, supra, as a `well-reasoned resolution of some of the questions involved in such a setoff against workers' compensation benefits,' we conclude that, under that authority, Fort James was not entitled to a setoff for the benefits it paid Irby for sick pay or for vacation or holiday pay. See Ex parte Dunlop Tire Corp., 706 So.2d at 734."
895 So.2d 282, 292-93 (Ala.Civ.App.2004). This Court granted the petition for the writ of certiorari in Irby to determine whether § 25-5-57(c)(1), Ala.Code 1975, allowed Fort James to set off sickness and accident benefits paid to Irby. This Court distinguished "sick pay" from "sick leave," stating that "sick leave" was an "`entitlement like wages for services performed,'" whereas "sick pay" was "`not in the nature of wages but, rather, [as] payment[ ] provided in lieu of compensation, based on the claimant's inability to work."' Ex parte Fort James Operating Co. 895 So.2d 294, 297 (Ala.2004). Fort James argued that its provision of sickness-and-accident benefits constituted "sick pay" and not "sick leave." Irby did not challenge Fort James's characterization of the benefits; rather, it argued that Fort James did not produce any evidence indicating that it had paid for the sickness-and-accident benefits. Section 25-5-57(c)(1) provides that an "employer may reduce ... the amount of benefits paid pursuant to a disability plan, retirement plan, or other plan providing for sick pay by the amount of compensation paid, if and only if the employer provided the benefits or paid for the plan...." This Court reversed the denial of the setoff, concluding that Fort James was entitled to the setoff because the sickness-and-accident benefits were funded by Fort James. Ex parte Fort James, supra. Although this Court reversed the Court of Civil Appeals' decision in regard to the sickness-and-accident benefits, the issue of setoff for the vacation and holiday pay was not addressed by this Court in Ex parte Fort James. Accordingly, the current state of the law does not entitle Fort James a setoff for vacation and holiday pay, thus the use of the 35-week wage credit as opposed to a 36-week wage credit.
[8] We note that the passage Stephens cites can now be found, somewhat edited, in 4 Arthur Larson & Lex K. Larson, Workers' Compensation Law § 82.02[3] (2007).