BOLIN, Justice.

I, Facts and Procedural History

On February 19, 2014, the Madison Circuit Court (“the trial court”) entered a judgment finding that Lisa Hanvey had suffered a compensable injury caused by her exposure to chemical fumes during the course of her employment with Madison Academy, Inc. (“the employer”). The trial court awarded Hanvey permanent-total-disability benefits in accordance with the Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975 (“the Act”). The Court of Civil Appeals reversed the trial court’s judgment. See Madison Academy, Inc.. v. Hanvey, 179 So.3d 118 (Ala.Civ. *137 App.2014). We granted Hanvey’s petition for a writ of certiorari to review whether the Court of Civil Appeals erred in reversing the trial court’s judgment awarding Hanvey benefits for a permanent total disability under the Act. We reverse and remand.

II. Standard of Review

In Ex parte Fort James Operating Co., 895 So.2d 294, 296 (Ala.2004), .this Court stated the standard of review on a petition for a writ of certiorari in a worker’s compensation case:
“ ‘On certiorari review, this Court accords no presumption of correctness to the legal conclusions of the intermediate appellate court. Therefore, we must apply de novo the standard of review that was applicable in the Court of Civil Appeals.’ Ex parte Toyota Motor Corp., 684 So.2d 132, 135 (Ala.1996). The Court of Civil Appeals, in turn, is bound by Ala.Code 1975, § 25 — 5—[81](e), which provides that legal issues are to be reviewed de novo, and requires that, the judgment of the trial court be affirmed if its factual findings are supported by substantial evidence.”
This Court has stated:
“A trial court’s judgment in a worker’s compensation case based on pure findings of fact will not be- reversed if it is supported by substantial evidence. § 25-5 — 81(e)(2), Ala.Code 1975. ‘[The appellate court] will not reverse the trial court’s finding of fact if that finding is supported by substantial, evidence — if that finding is supported by “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’ Ex parte Trinity Indus,, Inc,, 680 So.2d 262, 268-69 (Ala.1996) (quoting West v. Founders Life Assurance.Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). ‘Therefore, in such -a case the appellate court must view the facts in the light most favorable to the findings pf the trial court.’ Ex parte Professional Bus. Owners Ass’n Workers’ Comp. Fund, 867 So.2d [1099] at 1102 [(Ala.2003)]. Moreover, the Court of Civil Appeals observed in Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995), that “the [1992 Workers’ Compensation] Act did not alter the rule that [an appellate court] does not weigh the evidence before the trial court.” ’ Ex parte Phenix Rental Ctr., 873 So.2d 226, 229 (Ala.2003).”
Fort James Operating Co. v. Stephens, 996 So.2d 833, 835 (Ala.2008)
. III. Analysis
The trial court stated the following in its February 19,2014, judgment:
“Lisa Hanvey was 44 years old at the time pf the trial. She has a high school education,' including attending special education classes since elementary school. She reads on a third grade level. Her past work history hás included child care.
“The relationship of employer and employee between Ms. Hanvey and Madison Academy existed as of May 1, 2011,, and continued at least through September 2011. Both parties were subject to and governed, by the Workers’ Compensation Act of Alabama, as amended. Ms. Hanvey worked at Madison Academy as a janitor from September 2006 until her health prevented her from continuing in her job. On June 21, 2011, the employer-supplied doctor, Dr. Syed Hasan, took Ms. Hanvey off work, and she did not return to work again.
“Ms. Hanvey suffers from myasthenia gravis, a neuromuscular and autoimmune disease. The disease impairs the normal function of the neuromuscular *138 junction causing muscle fatigue: It produces an antibody which affects the function of the acetylcholine that enables muscle contraction. The consequence is that muscles become fatigued more easi- • ly.
“Ms. Harivey’s primary care physician is Dr. Cheryl Bazzle, who has treated Ms. Hanvey since September 27, 2005. She was also treated by a number of other doctors, including employer-provided physicians Dr. Syed Hasan and Dr. Laurence Carmichael.
“Following her last visit to her employer-provided physician, Dr. Carmichael, on July 26, 2011, Ms. Hanvey continued to receive necessary medical care from her primary care physician, Dr. Cheryl Bazzle. Neurologist Dr. Amit Arora,was the initial neurologist involved in her treatment. She was subsequently referred to Dr. Gwendolyn Claussen at Kirklin Clinic in Birmingham, Alabama. Dr. Anjaneyulu Alapati took over treatment of Ms. Hanvey’s myasthenia gravis since March 29, 2012. The medical bills for these doctors and hospital stays, to the extent they were paid, were paid by Ms. Hanvey’s private health insurance through Blue Cross and Blue Shield of Alabama. Ms. Han-vey went to the emergency room at Crestwood Hospital and at Huntsville Hospital on more than one occasion, where she was hospitalized for treatment of her symptomatic myasthenia gravis.
“Before her repeated exposure to cleaning and stripping and refinishing chemicals in May and June 2011, and the resulting respiratory distress and infection, her health condition had never prevented her from working at Madison Academy for any significant length of time; significantly, she was able to perform her job. Even the presence of diplopia, or double vision, which is characteristic of myasthenia gravis and which was noted during a routine eye exam in April 2011, did not prevent her from performing her job despite any preexisting conditions.
“In May and June of 2011, Ms. Han-vey was exposed to certain chemicals at work used to clean and treat the floors. Those chemicals are shown by their Material Safety Data Sheets to be capable of causing respiratory problems. For example, the urethane used on the gym floors may cause ‘nose and throat irritation, dizziness, headache, nausea or respiratory irritation.’ The Red Tornado wax stripper utilized by Defendant may cause harm when breathing large amounts. The baseboard cleaner and stripper utilized warns that it may ‘aggravate existing respiratory conditions such asthma.’ Her family physician. Dr. Bazzle, stated, ‘[Wlhen she got exposed to those floor chemicals, she did a crash and burn, I can’t breathe, show[ed] up in my office with an 02 sat on room air of 70 percent and had to go immediately into the ICU.’ The shortness of breath experienced by Ms. Han-vey on June 13, 2011, ‘was triggered by the chemicals,’ according to Dr. Bazzle, Her doctor further adds: ‘... she got exposed to chemicals, which flared up her — her respiratory problems that she had anyway and then triggered the im~ mune-mediated disease that she had going on.’
“The exposure to chemicals was more significant in Ms. Hanvey because, according to Dr. Bazzle, while ‘any one of us could get exposed to chemicals and develop a respiratory illness from it, ... it would probably not cause us to have to go on a ventilator or a BiPAP machine to maintain our oxygen level like it did her.... [Cjlearly, people who have myasthenia are going to get sicker than *139 other people will when they get respiratory infections or — or any — anything else that goes wrong with them. It’s going to be worse.’ According to Dr. Bazzle, Ms. Hanvey’s exposure to chemical fumes ‘acutely caused the decompen-sation of [myasthenia gravis]. It just worsened it, aggravated it,’ Dr. Bazzle, who, in her own words, knows Ms. Han-vey better than any other doctor and finds her to be credible, opines that Ms. Hanvey’s exposure to chemical fumes at Madison Academy aggravated the preexisting myasthenia gravis condition. Further, Dr. Bazzle concludes that, ‘in the absence of the exposure to the chemical fumes at work in the May and June time frame ... Lisa would not have suffered the disability at the time in the manner or degree she did.’
“During this time in June 2011, after her exposure to the stripping chemicals at work, she developed what was diagnosed as respiratory infection when exposed to the fumes, which Dr.' Aiapati calls a trigger of myasthenia weakness. She was referred to American Family Care by her employer, Madison Academy, on June 21, 2011, complaining of breathing fumes from the stripper ‘Red Tomado.’ Dr. Hasan recorded her symptoms as including difficulty breathing, shortness of breath and coughing, and he treated her with antibiotics. In addition to prescribing Lincomycin, Le-vaquine, and Cerón, Dr. Hasan injected an antibiotic and then followed with a strong oral antibiotic for treatment of the bronchial infection which developed from inhalation of fumes.
“These undisputed medical records are consistent with the testimony by the myasthenia expert, Dr. Aiapati, concerning ■ the interplay of infection • and myasthenia weakness. Likewise, Dr. Arora stated by letter of November 23, 2011, to Ms. Hanvey: ‘We also recommend that you stay away from a working environment that could exacerbate your medical condition.... I do believe that the exposure you have had to the chemicals more than likely caused respiratory difficulties that led to you being hospitalized in the intensive care unit and ultimately led to this diagnosis.... We would like to avoid further episodes in the future and we have recommended that you avoid any of these exposures in the future ’as well.’
“It is Dr. Bazzle’s opinion that Ms. Hanvey’s exposure to chemical fumes “worsened’ and aggravated the myasthe-nia gravis. This is a worsening of the underlying condition and not merely a recurrence of symptoms inherent in the etiology of the preexisting condition.
“The presence of strong chemicals at Lisa Hanvey’s workplace prior to her respiratory infection treated by the company doctor in June 2011 and her subsequent‘crash and burn’ hospitalization is undisputed. Ms. Hanvey’s own testimony coupled with the medical .testimony consistently establishes that Ms. Hanvey has suffered-through the exposure to strong chemicals that were part of her work, environment as a janitor at Madison Academy. No evidence was presented that Ms. Hanvey, was unable to perform her work at Madison Academy prior to the exposure.
“Through her job;- Lisa Hanvey came face to face with the two triggers of myasthenia weakness, according to Dr. Aiapati — infection and physical activity. The respiratory infection that likely led to her full-blown myasthenia gravis has been previously discussed; as for the presence of the second trigger, Ms. Hanvey performed work as a janitor requiring very physical activity. During the school term, Ms. Hanvey’s janitorial work included sweeping, mopping, dust *140 ing, cleaning windows, vacuuming, with limited furniture movement. With the end of the school term in May 2011, the physical work increased [beginning] with the emptying of the cafeteria for the stripping and refinishing of floors. This was followed in like manner in the classrooms where desks, chairs, ■ tables, bookshelves and filing cabinets had to-be removed. Scraping the stripper off the floors was also more physical and unusual duties, as was scrubbing the baseboards. Because these working conditions could trigger future .development of Ms. Hanvey’s. myasthenia gravis, her physicians , advised her to avoid such physical activity.' Dr. Claussen examined Ms. Hanvey on December 1, 2011, and stated that she was unable to work given the severity of her weakness. Dr. Arora completed a Clinical Assessment of Fatigue/Weakness which characterized Ms. Hanvey’s fatigue as being' present to such an extent as to be distracting to adequate performance of daily activities or work.
“John McKinney, a vocational expert, evaluated Ms. Hanvey, stating that she tested ‘functionally illiterate for all practical purposes.’ McKinney opined that, based upon the assessments of the various treating medical specialists, 'Ms. Hanvey would be ‘ineapable of performing or maintaining any and all types of substantial gainful activity in the competitive labor market — even at the Sedentary/Unskilled levels of exertion and proficiency.’ According to McKinney, who -was the only vocational expert to testify, Ms. Hanvey is not a viable candidate for vocational retraining assistance. McKinney’s report is established as fact in this matter. \ •
[[Image here]]
“The basis for compensation is the. decrease in earning capacity. Nashville Bridge Co. v. Honeycutt, 246 Ala. 319, 20 So.2d 591 (1945). As the Court in CVS Corp. v. Smith noted:
“‘The determination of the extent of disability is within the trial court’s discretion and cannot be disturbed on appeal if there is evidence to support it. Dolgencorp, Inc. v. Hudson, 924 So.2d 727, 734 (Ala.Civ.App.2006) (citing Golden Poultry Co. v. Staggs, 660 So.2d 1348, 1352 (Ala.Civ.App.1995)). With regard to determining whether an employee is permanently and totally disabled, this court has stated: “‘The test for total and permanent disability is the inability to perform one’s trade and the inability to find gainful employment.’ Fuqua v. City of Fairhope, 628 So.2d 758, 759 (Ala. Civ.App.1998). Bee also Liberty Trousers v. King, 627 So.2d 422, 424 (Ala.Civ.App.1998). A ‘permanent total disability’ is defined as including ‘any physical injury or mental impairment -resulting from an accident, which injury or impairment permanently and totally incapacitates the employee from working at and being retrained for gainful employment.’ § 25-5-57(a)(4)d, Ala.Code 1976; Russell v. Beech Aerospace Services, Inc., 598 So.2d 991, 992 (Ala.Civ.App.1992).” Alabama Catfish, Inc. v. James, 669 So.2d 917, 918 (Ala.Civ.App.1995). See also Boyd Bros. Transp., Inc., v.. Asmus, 540 So.2d 757, 759 (Ala.Civ.App.1988) (stating that § 25-5-57(a)(4)d., Ala.Code 1976, “requires that the employee be unable to perform his trade or unable to obtain reasonably gainful employment”).’
“CVS Corp. v. Smith, 981 So.2d 1128, 1136 (Ala.Civ.App.2007), Moreover, any disability award received by Lisa Han-vey is not subject to an apportionment for preexisting injuries as provided in Ala,Code [1975,], § 25 — 5—58[,] because *141 Ms. Hanvey. was able to perform her duties at work prior to the injury. ■

((

“Lisa Hanvey suffered a work-related injury through being subjected to the fumes'from strong chemicals in May and June of 2011 while at work as a janitor at Madison Academy. She was-able to perform her job -before this exposare. While she may arguably have' had a preexisting 'condition in the form'of myasthenia gravis, she is still entitled to collect workers’ compensation benefits because her employment has aggravated or combined with her myasthenia gravis to produce disability; significantly, her doctor has concluded that ‘her disease was worsened by the exposure to chemicals.’ Because she was able to perform her duties prior to the injury, Lisa Han-vey will receive compensation without regard for any preexisting medical condition or problems.
U
“Moreover, the Court finds that this work-related exposure has rendered Ms. Hanvey unable to return to work at her job or perform her accustomed trade. Hr. Alapati has testified that physical exercises increase the - symptoms- of myasthenia gravis and cause tiredness and fatigue. Ms. Hanvey’s health, coupled with her physical and mental limitations as noted in the vocational report and as obvious in her testimony and demeanor, will prevent any sort of new training. Indeed, she is excluded from the opportunity for any gainful employment that will provide comparable compensation and work duties, based on her own limitations, education, experience, physical and mental condition, and other factors noted by vocational expert John McKinney.
“The Court finds that Ms. Hanvey suffered a permanent injury at work, which renders her permanently and totally disabled under the workers’ compensation laws of this state. Accordingly, [Hanvey] is entitled to judgment in her favor for workers’ compensation benefits under..the Act.”
In this case, the parties do not dispute that Hanvey suffered a compensa-ble injury under the Act, which was caused by her exposure to chemical fumes during the course of her employment; instead, the dispute, as claimed by the employer, is whether Hanvey’s exposure to the chemical fumes only temporarily aggravated her underlying myasthenia gra-vis. On appeal, the employer argued, and the majority of the Court of Civil Appeals held, that Hanvey had proven only that her myasthenia gravis had been temporarily aggravated by her exposure to chemicals in the workplace. Specifically, the employer contended that- Hanvey experienced onlya temporary flare-up of her myasthenia gravis because, it said, the flare-up was resolved with medications and Hanvey had been in remission since Dr. Alapati began treating her. Thus, it says, ‘the trial court erred in awarding Hanvey permanent-total-disability' benefits. The issue for our review is whether the record contains substantial evidence to support the trial court’s-finding, that the injury Hanvey -suffered rendered her permanently and totally disabled - under the Act. Fort James Operating, supra. We conclude-that it does. ■ ■
The evidence before the trial court demonstrated that Hanvey’s exposure to the chemicals in the workplace caused a worsening and substantial acceleration of her underlying myasthenia gravis and that she was unable to return to work at her job or to perform her accustomed trade as a janitor. This “worsening,” according to the trial court, was a “worsening' of the underlying [myasthenia gravis] and not merely a *142 recurrence of symptoms inherent in the etiology of the preexisting condition.” Pri- or to her exposure to the chemicals, Han-vey had been working normally for the employer for approximately five years with no disabling symptoms. According to the testimony, myasthenia gravis is a slow, progressive disease. However, Dr. Bazzle testified in her deposition that, when Hanvey was exposed to the chemicals, “she did a crash and burn,” from which “she has not risen”; that Hanvey’s exposure to chemicals “acutely caused the decompensation of her [myasthenia gra-vis]”; and that, “in the absence of the exposure to the chemical fumes at work .,, [Hanvey] would not have suffered the disability at the time [and] in the manner [or] degree she did.” Dr. Bazzle testified as follows:
“Q. ... If she’s suffering from myasthenia gravis' as of May 23 of 2011, which you’ve indicated she was, but it had not been diagnosed and there was no treatment being rendered for the disease and it is a progressive disease, it’s medically possible, is it not, that the disease could naturally progress and worsen with time?
[[Image here]]
“A. No doubt that it could progress, usually on a slowly, you know, progressive path. But what happened to her was it was — might have been continuing to progress, but when she got exposed to those floor chemicals, she did a crash and bum, I can’t breathe, show[ed] up in my office with an 02 sat on room air of 70 percent and had to go immediately into the ICU.
«
“Q. I understand that, but my question was: Could shortness of breath have been triggered or aggravated by factors other than the chemicals?
[[Image here]]
“A. Her underlying condition was— was certainly a factor and yes, she’s overweight and probably deconditioned because of that and also deconditioned because she was chronically hi from the [myasthenia gravis] not being diagnosed. And then she got exposed to chemicals, which flared up her — her respiratory problems that she had anyway and then triggered the immune — mediated disease that she had going on. And there you have it, this whole milieu of — of factors, exactly what you described, multiple factors that — that went into a — a bad situation that she has not risen from.
[[Image here]]
“Q. ... How was the — how was [Han-vey’s] exposure to chemical fumes important in the development of myasthe-nia gravis?
[[Image here]]
“A. I think it — it acutely caused the decompensation of it.
[[Image here]]
“Q. Is it fair to say that in the absence of the exposure to the chemical fumes at ■work in the May and June time frame that [Hanvey] would not have suffered the disability at the time [and] in the manner or degree she did?
[[Image here]]
“A. Yes.”
(Emphasis added.)
In a letter dated November 23,2011, Dr. Arora recommended that Hanvey “stay away from a working environment that could exacerbate” her myasthenia gravis. Dr. Arora stated:
“I do believe that the exposure you have had to the chemicals more than likely caused respiratory difficulties that led to you being hospitalized in the intensive care and ultimately led to this diagnosis.
*143 “We would like to avoid further episodes in the future and we have recommended that you avoid any of these exposures in the future as well.”
Dr. Arora stated in a progress note dated January 13, 2012, that he did not believe that Hanvey was capable of long-term employment because of her physical condition.
Dr. Alapati testified that he last saw Hanvey on July 30, 2012,. and that her myasthenia gravis had been in remission for about six months. Dr. Alapati testified that myasthenia gravis could get better and worse, i,e., it could “wax and wane.” However, he stated the following regarding Hanvey’s ability to work:
“Q. With regard to Ms. Hanvey based on your last examination of her, do you have an opinion as to whether or not she’s able to be gainfully employed?
“A. Depending. If she did. like • work with desk work or something like that, a lot of people go to .work in the. desk work, but anything labor work, physical activities, lifting weight, I’d advise them not to do that because [they] can get more fatigued.
[[Image here]]
“Q. And you discussed what work you would restrict' your patients to. As I understood it, you would tell '■ the myasthenia gravis patients to stay away from physical work but they could do sedentary work, is my understanding correct?
“A. ‘It is, desk[work], yes.
[[Image here]]
“Q. Besides physical, work,.have you— are you aware of any other factors that can cause a waxing of the symptoms or an exacerbation of the symptoms?
“A. Mainly, in my opinion, physical work and then infections in the body are the two things that typically trigger weakness, myasthenia weakness.”
Although Hanvey’s myasthenia gravis eventually weijt into remission following a full-blown myasthenia gravis “crisis,” the medical testimony presented demonstrates that any attempt by Hanvey to engage in the type of physical labor she was able to perform before her exposure to chemicals would cause her myasthenia gravis to become symptomatic. As noted by the trial court, Hanvey’s jób as a janitor required very physical- work; it also required that she be exposed to chemicals. Moreover, the only vocational expert to testify in this case evaluated Hanvey and bpined that she would be “incapable of performing or maintaining any and all types of substantial ’gainful activity in the competitive labor market — even at the Sedentary/Unskilled levels of exertion and proficiency.” He further concluded that Hanvey was not a viable candidate for vocational-retraining assistance; hence, she is not a viable candidate for “desk” work. It is well settled that under the Act a worker is permanently and totally disabled if the worker is “ineapacitate[d] ... from working at and being retrained for gainful - employment.” Ala.Code 1975, § 25-5-57(a)(4)d. “A worker is not required to be totally helpless; he simply must be unable to perform his trade or obtain other gainful employment.” Ed-monds Indus. Coatings, Inc. v. Lolley, 893 So.2d 1-197, 1210 (Ala.Civ.App.2004). Moreover, “[t]he determination of the extent- of disability is within the trial court’s discretion and cannot be disturbed on appeal if there is evidence to support it.” CVS Corp. v. Smith, 981 So.2d 1128, 1136 (Ala.Civ.App.2007). Based on the foregoing, we conclude that there is substantial evidence to support the trial court’s finding that Hanvey was permanently and totally disabled as a result of her exposure to chemicals in the workplace, which re- *144 suited in a worsening and acceleration of her underlying myasthenia gravis. -See, e.g., Edmonds Indus. Coatings, 893 So.2d at 1210 (holding thaj; “substantial evidence supports the trial court’s determination that the worker was permanently and to-' tally disabled as a result of his allergy to paint fumes and. the resulting aggravation of his [chronic obstructive pulmonary disease],” despite the employer’s claim 'that the aggravation was only temporary). We also quote, in pertinent part, the following well reasoned summary written by Presiding Judge Thompson in his dissent in this case: . . .
• “From the evidence, the trial court reasonably could have concluded that Hanvey had [myasthenia gravis] before the refurbishing of [the employer’s] gym and classroom floors took place, but that the condition did not affect Hanvey’s job performance. The testimony of Dr. ArOra, as well as the testimony of Dr. ■Alapati, indicates that if Hanvey were to engage in physical = exertion, the [myasthenia gravis] symptoms would--return. Because Hanvey is functionally illiterate, she is not a candidate for what Dr. Alapati called ‘desk work.’ Therefore, even, if this court might have reached a different conclusion from the same-evidence; I believe the record contains substantial evidence to support, the trial court’s findings that Hanvey expe'rienced ‘a worsening of the underlying condition and not merely a recuffence of symptoms inherent in the etiology of the preexisting condition’ and that-the worsening of the [myasthenia gravis] resulted■ in Hanvey’s inability to perform her job as she had been able to do before her exposure to the chemicals. In other words, ■ the ¡record contains substantial evidence indicating that Han-vey’s exposure to the chemicals used in ■the refurbishing project hastened or accelerated the progression - of her [myasthenia gravis] symptoms to the point that she is no longer able to perform jobs for which she is qualified, regardless of whether the [myasthenia gravis] is in remission. Further, evidence indicates that Hanvey’s work-related ‘[myasthenia, gravis] crisis’ did not create a temporary situation from which Hanvey has recovered, or will ever recover, so as to be able to work again. The ‘[myasthenia gravis] crisis’ Hanvey experienced' accelerated the progression of the disease and left her worse off them, she was before her exposure to the chemicals. It cut short her working life, ie., her ability to earn. If not for the exposure to the chemicals, Hanvey might have been able to continue working normally for yearns to come.”
Madison Academy, Inc., 179 So.3d at 133 (Thompson, P.J., dissentingXemphasis added).
On appeal, this- Court must view the evidence in a light'most favorable to the trial court’s findings of fact. Fort James Operating,' 996 So.2d at 836. When substantial evidence supports the factual finding of the trial court, an appellate court may not reverse the trial court’s judgment because there is also substantial evidence that supports a.factual conclusion contrary to the' finding made by the trial court. See Boise Cascade Corp., v. Jackson, 997 So.2d 1042, 1047 (Ala.Civ.App.2008). Because we conclude that there was substantial .evidence to support the trial court’s determination that Hanvey was permanently and totally disabled, we reverse the judgment of the Court of Civil Appeals and remand the cause to that court for proceedings consistent with this opinion.

IV, Conclusion

The judgment of the Court-of Civil Appeals is reversed and the case remanded *145 for proceedings consistent with this opinion.
REVERSED AND REMANDED.
MOORE, C.J., and STUART, PARKER, SHAW, MAIN, WISE, and BRYAN, JJ., concur.
MURDOCK, J., dissents.